## AMERICAN TOBACCO CO. ET AL. *v.* UNITED STATES.

NO. 18.

Argued November 7, 8, 1945.—Decided June 10, 1946.

782

George W. Whiteside and Milton Handler argued the cause for petitioners in No. 18.   With them on the brief was John A. V. Murphy.

Bethuel M. Webster argued the cause for petitioners in No. 19.   With him on the brief was Francis H. Horan.

*Harold F. McGuire* argued the cause for petitioners in No. 20. With him on the brief were *B. S. Womble, Thomas Turner Cooke* and *Richard C. Stoll.*

*Assistant Attorney General Berge* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, Charles H. Weston* and *Robert L. Stern.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The petitioners are The American Tobacco Company, Liggett & Myers Tobacco Company, R. J. Reynolds Tobacco Company,[1] American Suppliers, Inc., a subsidiary of American, and certain officials of the respective companies who were convicted by a jury, in the District Court of the United States for the Eastern District of Kentucky, of violating §§ 1 and 2 of the Sherman Anti-Trust Act, pursuant to an information filed July 24, 1940, and modified October 31, 1940.

Each petitioner was convicted on four counts: (1) conspiracy in restraint of trade, (2) monopolization, (3) attempt to monopolize, and (4) conspiracy to monopolize. Each count related to interstate and foreign trade and commerce in tobacco. No sentence was imposed under the third count as the Court held that that count was merged in the second. Each petitioner was fined $5,000 on each of the other counts, making $15,000 for each petitioner and a total of $255,000. Seven other defendants were found not guilty and a number of the original defendants were severed from the proceedings pursuant to stipulation.

The Circuit Court of Appeals for the Sixth Circuit, on December 8, 1944, affirmed each conviction. 147 F. 2d

---

[1] Here referred to as American, Liggett and Reynolds.

93. All the grounds urged for review of those judgments were considered here on petitions for certiorari. On March 26, 1945, this Court granted the petitions but each was "limited to the question whether actual exclusion of competitors is necessary to the crime of monopolization under § 2 of the Sherman Act." 324 U. S. 836. On April 19, 1945, Reynolds, et al., filed a petition for rehearing and enlargement of the scope of review in their case but it was denied. 324 U. S. 891. This opinion is limited to the convictions under § 2 of the Sherman Act[2] and deals especially with those for monopolization under the second count of the information.

The issue thus emphasized in the order allowing certiorari and primarily argued by the parties has not been previously decided by this Court. It is raised by the following instructions which were especially applicable to the second count[3] but were related also to the other counts under § 2 of the Sherman Act:

"Now, the term 'monopolize' as used in Section 2 of the Sherman Act, as well as in the last three counts

---

[2] "SEC. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 26 Stat. 209, 15 U. S. C. § 2.

[3] The second count included particularly the following:

"Before and during the period of three years next preceding the filing of this information, . . . defendants, . . . well knowing the foregoing facts, have, . . . unlawfully monopolized the aforesaid interstate and foreign trade and commerce in tobacco, in violation of Section Two of the Act of Congress of July 2, 1890, . . .

. . . . , . . . .

"In adopting and exercising such methods, means and practices, each defendant has acted with full knowledge that unanimity

of the Information, means the joint acquisition or maintenance by the members of a conspiracy formed for that purpose, of the *power to control and dominate interstate trade and commerce in a commodity to such an extent that they are able, as a group, to exclude actual or potential competitors from the field, accompanied with the intention and purpose to exercise such power.*

"The phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it, which methods, means and practices are so employed by the members of and pursuant to a combination or conspiracy formed for the purpose of such accomplishment.

"It is in no respect a violation of the law that a number of individuals or corporations, each acting for himself or itself, may own or control a large part, or even all of a particular commodity, or all the business in a particular commodity.

"*An essential element* of the illegal monopoly or monopolization charged *in this case is the existence*

of action with reference thereto was and would be the policy, intent and practice of the others, that such unanimity of action would necessarily result in drawing to defendant major tobacco companies as a group the power to dominate, control, and exclude others from the aforesaid interstate and foreign trade and commerce, has intended such result, and such result has in fact been achieved.

"Said unlawful monopolization has had the effects, among others, of permitting a few companies to attain control of a bottleneck in a great industry, through which a major farm commodity, on which several million are dependent, must pass, on its way through the hands of jobbers and retailers, to the many millions of people who use tobacco products; of enabling these few companies to abuse their resulting strategic and dominant position, by making the income of growers of leaf tobacco lower than it otherwise would have been; by making the income of distributors and other manufacturers of tobacco products lower than it otherwise would have been; and by keeping from all other groups in the industry, and from consumers, the benefits which otherwise would flow from free, vigorous and normal competition."

*of a combination or conspiracy to acquire and maintain the power to exclude competitors to a substantial extent.*

"Thus you will see that *an indispensable ingredient of each of the offenses charged in the Information is a combination or conspiracy.*"    (Italics supplied.)

While the question before us, as briefly stated in the Court's order, makes no express reference to the inclusion, in the crime of "monopolization," of the element of "a combination or conspiracy to acquire and maintain the power to exclude competitors to a substantial extent," yet the trial court, in its above quoted instructions to the jury, described such a combination or conspiracy as an "essential element" and an "indispensable ingredient" of that crime in the present cases. We therefore include that element in determining whether the foregoing instructions correctly stated the law as applied to these cases. In discussing the legal issue we shall assume that such a combination or conspiracy to monopolize has been established. Because of the presence of that element, we do not have here the hypothetical case of parties who themselves have not "achieved" monopoly but have had monopoly "thrust upon" them. See *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 429.

The present cases are not comparable to cases where the parties, for example, merely have made a new discovery or an original entry into a new field and unexpectedly or unavoidably have found themselves enjoying a monopoly coupled with power and intent to maintain it. In the *Aluminum Co.* case, discussed later, there was a use of various unlawful means to establish or maintain the monopoly. Here we have the additional element of a combination or conspiracy to acquire or maintain the power to exclude competitors that is charged in the fourth count.

The present opinion is not a finding by this Court one way or the other on the many closely contested issues of fact. The present opinion is an application of the law to the facts as they were found by the jury and which the Circuit Court of Appeals held should not be set aside.[4] The trial court's instruction did not call for proof of an "actual exclusion" of competitors on the part of the petitioners. For the purposes of this opinion, we shall assume, therefore, that an actual exclusion of competitors by the petitioners was not claimed or established by the prosecution. Simply stated the issue is: Do the facts called for by the trial court's definition of monopolization amount to a violation of § 2 of the Sherman Act?

Before reaching that issue we shall touch upon another contention which the petitioners have made and which the Government has undertaken to answer. This is the contention that the separate convictions returned under the conspiracy count in restraint of trade and under the conspiracy count to monopolize trade amount to double jeopardy, or to a multiplicity of punishment in a single proceeding, and therefore violate the Fifth Amendment to the Federal Constitution.[5] The petitioners argue that § 2 of the Sherman Act should be interpreted to require proof of actual exclusion of competitors in order to show "monopolization," and they claim that only thus can a "conspiracy to monopolize" trade be sufficiently differentiated from a "conspiracy in restraint of" trade as to avoid subjecting the parties accused under those counts to double jeopardy.

---

[4] The verdict in a criminal case is sustained only when there is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt," that the accused is guilty. *Mortensen* v. *United States,* 322 U. S. 369, 374.

[5] ". . . nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; . . ."

Petitioners seek support for these contentions as to the two conspiracy counts from the principles stated in *Braverman* v. *United States,* 317 U. S. 49, and in *Block-burger* v. *United States,* 284 U. S. 299. On the authority of the *Braverman* case, petitioners claim that there is but one conspiracy, namely, a conspiracy to fix prices. In contrast to the single conspiracy described in that case in separate counts, all charged under the general conspiracy statute, § 37, Criminal Code, 35 Stat. 1096, 18 U. S. C. § 88, we have here separate statutory offenses, one a conspiracy in restraint of trade that may stop short of monopoly, and the other a conspiracy to monopolize that may not be content with restraint short of monopoly. One is made criminal by § 1 and the other by § 2 of the Sherman Act.

We believe also that in accordance with the *Blockburger* case, §§ 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap. Cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 226. In the present cases, the court below has found that there was more than sufficient evidence to establish a conspiracy in restraint of trade by price fixing and other means, and also a conspiracy to monopolize trade with the power and intent to exclude actual and potential competitors from at least a part of the tobacco industry.

Petitioners further suggest that the second count (to monopolize), and the fourth count (to conspire to monopolize), may lead to multiple punishment, contrary to the principle of the *Blockburger* case. Petitioners argue that the Government's theory of monopolization calls for proof of a joint enterprise with power and intent to exclude competitors and, therefore, that the conspiracy to monop-

olize must be a part of that proof. It long has been settled, however, that a "conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy." *United States* v. *Rabinowich,* 238 U. S. 78, 85; *Pinkerton* v. *United States,* 328 U. S. 640, 643. Petitioners, for example, might have been convicted here of a conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy, *i. e.,* to exclude actual and potential competitors from the cigarette field. Cf. *United States* v. *Shapiro,* 103 F. 2d 775, 776.

Although there is no issue of fact or question as to the sufficiency of the evidence to be discussed here, nevertheless, it is necessary to summarize the principal facts of that conspiracy to monopolize certain trade, which was charged in the fourth count. These facts demonstrate also the vigor and nature of the intent of the petitioners to exclude competitors in order to maintain that monopoly if need or occasion should offer itself to attempt such an exclusion. To support the verdicts it was not necessary to show power and intent to exclude *all* competitors, or to show a conspiracy to exclude *all* competitors. The requirement stated to the jury and contained in the statute was only that the offenders shall "monopolize any part of the trade or commerce among the several States, or with foreign nations." This particular conspiracy may well have derived special vitality, in the eyes of the jury, from the fact that its existence was established, not through the presentation of a formal written agreement, but through the evidence of widespread and effective conduct on the part of petitioners in relation to their existing or potential competitors.

The three years at issue in the charges made were those immediately preceding the filing of the informations on

July 24, 1940,[6] but for convenience the statistics relied upon generally have been those for the calendar years 1937, 1938 and 1939. Because of the circumstantial nature of most of the evidence and because of the essentiality of figures for comparative years in establishing any restraint of trade or monopoly, the record also contains much important material drawn from earlier years. Some appreciation of the history and development of the cigarette industry is essential to an understanding of the cases. However, in applying the law to the central issue in these cases, the variations among the several petitioners participating in each step are not material in reaching the conclusion on the legal question before us. There were many variations in the business activities of the several petitioners. It would be cumbersome and difficult to state exactly which petitioners and what combination of petitioners did each of the acts mentioned. It is, however, not fair to refer, without explanation, to all the acts simply as having been done by "the petitioners." In its usual sense, "the petitioners" would include all of them. Obviously, however, the corporate and individual petitioners did not and could not all act precisely alike. To refer only to "the corporate petitioners" would be unsatisfactory because, in addition to American, Liggett and Reynolds, there is the corporate petitioner, American Suppliers, Inc. It participated in only a limited number of activities and then only as a subsidiary of American. Furthermore, as pointed out by Reynolds in its petition for rehearing and for enlargement of scope of review in its

---

[6] "No person shall be prosecuted, tried, or punished for any offense, not capital, . . . unless the indictment is found, or the information is instituted, within three years next after such offense shall have been committed." Rev. Stat. § 1044, as amended by 45 Stat. 51, 18 U. S. C. § 582.

case, Reynolds' participation in some parts of the combination or conspiracy differs in many respects from that of American and Liggett.

The fact is that Reynolds, in 1913, actually broke into the cigarette field with its Camel cigarettes, and, as a vigorous competitor of American, Liggett and P. Lorillard Company, revolutionized the cigarette industry. Gradually Reynolds grew to be one of the "Big Three" with American and Liggett. The later evidence then tends to show that those three, in spite of the earlier competitive history of Reynolds, have operated together in recent years in violation of the Sherman Act. Similarly, much of the evidence relating to the purchase of tobacco at auction does not apply in precisely equal degree to each petitioner. However, taking the story as a whole, each petitioner now has been convicted of the same offense under like counts and the problem before us is only to state the rule of law to be applied in defining monopolization under the Sherman Act as applied to all of the petitioners alike. To distinguish among them at each stage would not change the legal conclusion on the one issue here presented but would confuse what should be a clear summary of the facts essential to an understanding of that legal issue. Accordingly, each reference to "petitioners" in this recital will mean "some or all of the petitioners as disclosed by the record."

First of all, the monopoly found by the jury to exist in the present cases appears to have been completely separable from the old American Tobacco Trust which was dissolved in 1911.[7] The conspiracy to monopolize and

---

[7] The history of the tobacco industry in America and of the litigation which resulted in the dissolution of the tobacco trust in 1911 is set forth in *United States* v. *American Tobacco Co.*, 221 U. S. 106–193. See also, *United States* v. *American Tobacco Co.*, 191 F. 371–431,

the monopolization charged here do not depend upon proof relating to the old tobacco trust but upon a dominance and control by petitioners in recent years over purchases

containing the decree of dissolution and see 164 F. 700–728, 1024, for the report of the case in the Circuit Court. While the names of some of the parties in the earlier case are those of the present petitioners, the present proceedings do not reflect a failure on their part to observe the requirements of the 1911 decree. Although the decree of dissolution resulted in the separation of assets among the American, Liggett and Reynolds companies, as well as P. Lorillard Company and others, there is no contention here that common ownership of stock and the interlocking of officers and directors among those companies have continued to exist. The tobacco industry also has changed from one dealing primarily in the distribution of smoking tobacco, chewing tobacco, little cigars and cigarettes to one dealing primarily in cigarettes. The record shows that in 1910 the weight of the tobacco used in the domestic manufacture of cigarettes was about 31,000,000 pounds out of 522,000,000 pounds, or less than 6%, whereas in 1939, it was 509,000,000 pounds out of 885,000,000 pounds, or 57.5%.

By the 1911 decree, the cigarette brands of the trust were distributed as follows: To American: Sweet Caporal, Pall Mall, Hassan and Mecca. To Liggett: American Beauty, Fatima, Piedmont, Imperiales, Home Run and King Bee. To P. Lorillard Company: Helmar, Murad, Mogul, Turkish Trophies and Egyptian Deities. Neither the old trust nor the petitioners in the present cases have ever done much general cigar business. Reynolds in 1911 had no cigarette business and it received none by the decree. It then was small in comparison with the other companies named. In 1913, it put its Camel cigarettes on the market. These were neither Turkish, pseudo-Turkish, nor Virginia cigarettes. They were made largely of burley tobacco which had not been used in any successful cigarette up to that time. They were "cased" or flavored—an old process in preparing plug tobacco but an innovation in cigarettes. That competition was highly successful. Reynolds' sales rose to where, in 1919, it made about 40% of all domestic cigarette sales in the United States. By 1917 its total production exceeded by 50% the total national production of cigarettes in 1911. In 1916, American launched a new brand of burley cigarettes—Lucky Strikes. Liggett changed its Chesterfield

of the raw material and over the sale of the finished product in the form of cigarettes. The fact, however, that the purchases of leaf tobacco and the sales of so many products of the tobacco industry have remained largely within the same general group of business organizations for over a generation, inevitably has contributed to the ease with which control over competition within the industry and the mobilization of power to resist new competition can be exercised. A friendly relationship within such a long established industry is, in itself, not only natural but commendable and beneficial, as long as it does not breed illegal activities. Such a community of interest in any industry, however, provides a natural foundation for working policies and understandings favorable to the insiders and unfavorable to outsiders. The verdicts indicate that practices of an informal and flexible nature were adopted and that the results were so uniformly beneficial to the petitioners in protecting their common interests as against those of competitors that, entirely from circumstantial evidence, the jury found that a combination or conspiracy existed among the petitioners from 1937 to 1940, with power and intent to exclude competitors to such a substantial extent as to violate the Sherman Act as interpreted by the trial court.[8]

brand from a Virginia type cigarette to a burley blend. Lorillard, in 1926, launched a new brand of Old Gold cigarettes. By that time the "Big Three" were American, Liggett and Reynolds and those companies are the three cigarette-producing companies that are parties to the present proceedings.

[8] The identity of the parties referred to in the present cases is more readily recognizable when they are identified with their products as follows:

American—Lucky Strike, Pall Mall (by a subsidiary), Herbert Tareyton cigarettes, Bull Durham tobacco, about 50 brands of chewing tobacco and hundreds of brands of smoking tobacco.

Liggett—Chesterfield and about 15 other brands of cigarettes, 45

The position of the petitioners in the cigarette industry from 1931 to 1939 is clear from the following tables:

PERCENTAGE OF TOTAL U. S. PRODUCTION OF SMALL CIGARETTES—1931–1939.

| | 1931 | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|---|---|---|---|
| American | 39.5 | 36.6 | 33.0 | 26.1 | 24.0 | 22.5 | 21.5 | 22.7 | 22.9 |
| Liggett | 22.7 | 23.0 | 28.1 | 27.4 | 26.0 | 24.6 | 23.6 | 22.9 | 21.6 |
| Reynolds | 28.4 | 21.8 | 22.8 | 26.0 | 28.1 | 29.5 | 28.1 | 25.3 | 23.6 |
| Lorillard | 6.5 | 5.2 | 4.7 | 4.1 | 3.8 | 4.3 | 4.7 | 5.1 | 5.8 |
| Brown & Williamson | 0.2 | 6.9 | 5.5 | 8.3 | 9.6 | 9.6 | 9.9 | 9.9 | 10.6 |
| Philip Morris | 0.9 | 1.4 | 0.8 | 2.0 | 3.1 | 4.1 | 5.4 | 5.7 | 7.1 |
| Stephano | 0.1 | 0.1 | 0.2 | 0.5 | 1.4 | 1.9 | 2.5 | 3.1 | 3.3 |
| Axton-Fisher | 0.7 | 3.1 | 4.4 | 4.4 | 3.0 | 2.2 | 2.4 | 2.7 | 2.4 |
| Larus | 0.2 | 1.0 | 0.2 | 0.6 | 0.7 | 0.8 | 1.0 | 1.3 | 1.3 |
| Combined Percentages of American, Liggett and Reynolds | 90.7 | 81.4 | 83.9 | 79.5 | 78.0 | 76.7 | 73.3 | 71.0 | 68.0 |

brands of smoking tobacco, including Velvet and Duke's Mixture and over 25 brands of chewing tobacco.

Reynolds—Camel cigarettes, 12 brands of smoking tobacco, including Prince Albert, and 88 brands of chewing tobacco.

P. Lorillard Company—Old Gold, and Sensation cigarettes, as well as other tobacco products.

Philip Morris & Co., Ltd., Incorporated—Philip Morris, and Paul Jones cigarettes.

British-American Tobacco Company, Limited—Many tobacco products, including those of its subsidiary, Brown & Williamson Tobacco Corporation.

Brown & Williamson Tobacco Corporation—Raleigh cigarettes.

The Imperial Tobacco Company, Ltd.—Tobacco products sold in Great Britain and Ireland.

Universal Leaf Tobacco Company, Inc.—Dealers in leaf tobacco.

Stephano Brothers, Axton-Fisher Tobacco Company and Larus Bro. Co., Inc., are all producers of the so-called "10 cent cigarettes." Their cigarettes, like certain comparable cigarettes produced by P. Lorillard Company and by Philip Morris & Co., Ltd., Incorporated, generally sell for 10 cents a package in contrast to 13 or 15 cents or more for the leading brands of burley blend cigarettes.

VOLUME OF CIGARETTE PRODUCTION—1931–1939.

(Billions of cigarettes.)

| | 1931 | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|---|---|---|---|
| Total U. S. Production | 117.1 | 106.6 | 114.9 | 130.0 | 140.0 | 158.9 | 170.0 | 171.7 | 180.7 |
| American | 46.2 | 39.0 | 37.9 | 33.9 | 33.5 | 35.8 | 36.6 | 39.0 | 41.4 |
| Liggett | 26.6 | 24.6 | 32.2 | 35.6 | 36.3 | 39.1 | 40.2 | 39.3 | 39.0 |
| Reynolds | 33.3 | 23.2 | 26.2 | 33.8 | 39.4 | 46.9 | 47.8 | 43.5 | 42.6 |
| Lorillard | 7.6 | 5.5 | 5.4 | 5.3 | 5.3 | 6.8 | 8.1 | 8.8 | 10.5 |
| Brown & Williamson | 0.3 | 7.3 | 6.3 | 10.8 | 13.4 | 15.2 | 16.8 | 17.1 | 19.1 |
| Philip Morris | 1.0 | 1.5 | 0.9 | 2.6 | 4.4 | 6.4 | 9.2 | 9.7 | 12.8 |
| Stephano | 0.1 | 0.1 | 0.2 | 0.7 | 2.0 | 3.0 | 4.2 | 5.4 | 6.0 |
| Axton-Fisher | 0.8 | 3.3 | 5.0 | 5.7 | 4.2 | 3.5 | 4.1 | 4.5 | 4.3 |
| Larus | 0.3 | 1.0 | 0.3 | 0.7 | 1.0 | 1.2 | 1.7 | 2.2 | 2.3 |
| Combined volume of American, Liggett and Reynolds | 106.1 | 86.8 | 96.3 | 103.3 | 109.2 | 121.8 | 124.6 | 121.8 | 123.0 |

The first table shows that, although American, Liggett and Reynolds gradually dropped in their percentage of the national domestic cigarette production from 90.7% in 1931 to 73.3%, 71% and 68%, respectively, in 1937, 1938 and 1939, they have accounted at all times for more than 68%, and usually for more than 75%, of the national production. The balance of the cigarette production has come from six other companies. No one of those six ever has produced more than the 10.6% once reached by Brown & Williamson in 1939. The second table shows that, while the percentage of cigarettes produced by American, Liggett and Reynolds in the United States dropped gradually from 90.7% to 68%, their combined volume of production actually increased from 106 billion in 1931 to about 125 billion, 122 billion and 123 billion, respectively, in 1937, 1938 and 1939. The remainder of the production was divided among the other six companies. No one of those six ever has produced more than about 19 billion cigarettes a year, which was the high point reached by Brown & Williamson in 1939.

The further dominance of American, Liggett and Reynolds within their special field of burley blend cigarettes, as

compared with the so-called "10 cent cigarettes," is also apparent. In 1939, the 10 cent cigarettes constituted about 14½% of the total domestic cigarette production. Accordingly, the 68% of the total cigarette production enjoyed by American, Liggett and Reynolds amounted to 80% of that production within their special field of cigarettes. The second table shows a like situation. In 1939, the 10 cent cigarettes accounted for 25.6 billion of the cigarettes produced. Deducting this from the 57.7 billion cigarettes produced by others than American, Liggett and Reynolds left only about 32 billion cigarettes of a comparable grade produced in that year by competitors of the "Big Three" as against the 123 billion produced by them. In addition to the combined production by American, Liggett and Reynolds in 1939 of over 68% of all domestic cigarettes, they also produced over 63% of the smoking tobacco and over 44% of the chewing tobacco. They never were important factors in the cigar or snuff fields of the tobacco industry.

The foregoing demonstrates the basis of the claim of American, Liggett and Reynolds to the title of the "Big Three." The marked dominance enjoyed by each of these three, in roughly equal proportions, is emphasized by the fact that the smallest of them at all times showed over twice the production of the largest outsider. Without adverse criticism of it, comparative size on this great scale inevitably increased the power of these three to dominate all phases of their industry. "Size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *United States* v. *Swift & Co.*, 286 U. S. 106, 116. An intent to use this power to maintain a monopoly was found by the jury in these cases.

The record further shows that the net worth of American, Liggett and Reynolds in terms of their total assets,

less current liabilities, rose from $277,000,000 in 1912 to over $551,000,000 in 1939. Their net annual earnings, before payment of interest and dividends, rose from about $28,000,000 in 1912 to over $75,000,000 in 1939. The record is full of evidence of the close relationship between their large expenditures for national advertising of cigarettes and resulting volumes of sales. In each of the years 1937, 1938 and 1939, American, Liggett and Reynolds expended a total of over $40,000,000 a year for advertising. Such advertising is not here criticized as a business expense. Such advertising may benefit indirectly the entire industry, including the competitors of the advertisers. Such tremendous advertising, however, is also a widely published warning that these companies possess and know how to use a powerful offensive and defensive weapon against new competition. New competition dare not enter such a field, unless it be well supported by comparable national advertising. Large inventories of leaf tobacco, and large sums required for payment of federal taxes in advance of actual sales, further emphasize the effectiveness of a well financed monopoly in this field against potential competitors if there merely exists an intent to exclude such competitors. Prevention of all potential competition is the natural program for maintaining a monopoly here, rather than any program of actual exclusion. "Prevention" is cheaper and more effective than any amount of "cure."

With this background of a substantial monopoly, amounting to over two-thirds of the entire domestic field of cigarettes, and to over 80% of the field of comparable cigarettes, and with the opposition confined to several small competitors, the jury could have found from the actual operation of the petitioners that there existed a combination or conspiracy among them not only in restraint of trade, but to monopolize a part of the tobacco

industry. The trial court described this combination or conspiracy as an "essential element" and "indispensable ingredient" of the offenses charged. It is therefore only in conjunction with such a combination or conspiracy that these cases will constitute a precedent. The conspiracy so established by the verdicts under the second count appears to have been one to fix and control prices and other·material conditions relating to the purchase of raw material in the form of leaf tobacco for use in the manufacture of cigarettes. It also appears to have been one to fix and control prices and other material conditions relating to the distribution and sale of the product of such tobacco in the form of cigarettes. The jury found a conspiracy to monopolize to a substantial degree the leaf market and the cigarette market. The jury's verdicts also found a power and intent on the part of the petitioners to exclude competition to a substantial extent in the tobacco industry.

## I.

The verdicts show that the jury found that the petitioners conspired to fix prices and to exclude undesired competition against them in the purchase of the domestic type of flue-cured tobacco and of burley tobacco. These are raw materials essential to the production of cigarettes of the grade sold by the petitioners and also, to some extent, of the 10 cent grade of cigarettes which constitutes the only substantial competition to American, Liggett and Reynolds in the cigarette field of the domestic tobacco industry. The tobaccos involved in these cases are the flue-cured, burley and Maryland tobaccos. The flue-cured or bright tobacco is grown in a number of areas called "belts." These are in Virginia, North Carolina, South Carolina, Georgia and Florida. The tobacco takes its name of flue-cured from the "curing" process to which

it is subjected and which consists of hanging the tobacco leaves in barns heated by a system of flues. Between 50% and 60% of the total flue-cured product is for export to England. The petitioners purchased a combined total of between 50% and 80% of the domestic flue-cured tobacco. The burley tobacco is produced largely in the burley belt in Kentucky and Tennessee. It is cured without heating, by exposing the leaves to the air in barns in which they are hung. The petitioners purchased from 60% to 80% of the annual crop of burley. The Maryland tobacco is grown in the southern part of that State. Some of it is sold in auction markets, the rest is packed in hogsheads and sold in two Baltimore warehouses by the Maryland Tobacco Growers' Association and by commercial merchants. The greater part of the Maryland tobacco was purchased by petitioners. The crops in the more southerly belts mature first and the burley crops are not ready for market until late fall. When the tobacco is ready for market the farmers strip, sort and grade the leaves according to their judgment as to quality, tie them into bundles called "hands" (except in Georgia where the tobacco remains loose), and truck them to tobacco auction markets. In the possession of the farmers the crops are perishable as they require a redrying process. Under the modern system of marketing, the tobacco cannot be stored to await another season. The farmers have no facilities for redrying the tobacco and therefore must sell their crops in the season in which those crops are raised or they will lose them. The petitioners kept large enough tobacco stocks on hand to last about three years. The value of these stocks was over $100,000,000 for each company and these stocks assured their independence of the market in any one year. Auction markets for the sale of leaf tobacco have been in operation for many years and were well established long before the dissolution of

the tobacco trust in 1911.[9]  Such markets are located in 75 towns in the flue-cured region and 42 towns in the burley area.  There are four Maryland markets.  Since the crop in the Georgia Belt matures first, the markets in that belt open first, usually about August 1.  The auctioneers then follow the marketing seasons to the North, reaching the "Old Belt" in North Carolina and Virginia in the latter part of September.  The dates for opening the markets in the flue-cured belts are set by the Tobacco Association of the United States of which buyers, including petitioners, warehousemen and others connected with the industry, but not including farmers, are members.  Burley sales begin in Lexington, Kentucky, which is the principal market, on the first Monday in December.  The other burley markets open the next day. Sales continue, excepting at Christmas time, for the next few months.

The Government introduced evidence showing that, although there was no written or express agreement discovered among American, Liggett and Reynolds, their practices included a clear course of dealing.  This evidently convinced the jury of the existence of a combination or conspiracy to fix and control prices and practices as to domestic leaf tobacco, both in restraint of trade as such, and to establish a substantially impregnable defense against any attempted intrusion by potential competitors into these markets.

It appeared that petitioners refused to purchase tobacco on these markets unless the other petitioners were also represented thereon.  There were attempts made by

---

[9] For a description of the auction methods of selling in Georgia, see *Townsend* v. *Yeomans,* 301 U. S. 441, 445, and in North Carolina, see *Currin* v. *Wallace,* 306 U. S. 1, 7–8.  See also, market practices described in the report of the Committee on Agriculture of the House of Representatives, June 5, 1935, to accompany H. R. 8026.  H. Rep. No. 1102, 74th Cong., 1st Sess.

others to open new tobacco markets but none of the petitioners would participate in them unless the other petitioners were present. Consequently, such markets were failures due to the absence of buyers. It appeared that the tobacco farmers did not want to sell their tobacco on a market in which the only purchasers were speculators or dealers. The prices paid under such circumstances were likely to be low in order that the purchasers eventually might resell the tobacco to the manufacturing companies. The foreign purchasers likewise would not participate without the presence of the petitioners. In this way the new tobacco markets and their locations were determined by the unanimous consent of the petitioners and, in arriving at their determination, the petitioners consulted with each other as to whether or not a community deserved a market.

The Government presented evidence to support its claim that, before the markets opened, the petitioners placed limitations and restrictions on the prices which their buyers were permitted to pay for tobacco. None of the buyers exceeded these price ceilings. Grades of tobacco were formulated in such a way as to result in the absence of competition between the petitioners. There was manipulation of the price of lower grade tobaccos in order to restrict competition from manufacturers of the lower priced cigarettes. Methods used included the practice of the petitioners of calling their respective buyers in, prior to the opening of the annual markets, and giving them instructions as to the prices to be paid for leaf tobacco in each of the markets. These instructions were in terms of top prices or price ranges. The price ceilings thus established for the buyers were the same for each of them. In case of tie bids the auctioneer awarded the sale customarily to the buyer who bid first. Under this custom the buyers representing the petitioners often made bids on various baskets of tobacco

before an opening price could be announced so that they might have their claim to the tobacco recognized at the understood ceiling price in the case of tie bids. Often a buyer would bid ahead by indicating that he wanted a certain basket further along in the line of baskets and, in such cases, the tobacco in question was awarded to such buyer without the mention of any price, it being understood that it was sold at the top price theretofore previously determined upon.

Where one or two of the petitioners secured their percentage of the crop on a certain market or were not interested in the purchase of certain offerings of tobacco, their buyers, nevertheless, would enter the bidding in order to force the other petitioners to bid up to the maximum price. The petitioners were not so much concerned with the prices they paid for the leaf tobacco as that each should pay the same price for the same grade and that none would secure any advantage in purchasing tobacco. They were all to be on the same basis as far as the expenses of their purchases went. The prices which were set as top prices by petitioners, or by the first of them to purchase on the market, became, with few exceptions, the top prices prevailing on those markets. Competition also was eliminated between petitioners by the purchase of grades of tobacco in which but one of them was interested. To accomplish this, each company formulated the grades which it alone wished to purchase. The other companies recognized the grades so formulated as distinctive grades and did not compete for them. While the differences between the grades so formulated were distinguishable by the highly trained special buyers, they were in reality so minute as to be inconsequential. This element, however, did not mean that a company could bid any price it wished for its especially formulated grades of tobacco. The other companies prevented that by bidding up the tobacco, at least to a point where they did not risk being

awarded the sale to themselves. Each company determined in advance what portion of the entire crop it would purchase before the market for that season opened. The petitioners then separately informed their buyers of the percentage of the crop which they wished to purchase and gave instructions that only such a percentage should be purchased on each market. The purchases were spread evenly over the different markets throughout the season. No matter what the size of the crop might be, the petitioners were able to purchase their predetermined percentages thereof within the price limits determined upon by them, thus indicating a stabilized market. The respective petitioners employed supervisors whose functions were to see that the prices were the same on one market as on another. Where, because of difference in appraisals of grades or other similar factors, the bidding was out of line with the predetermined price limits or there was a tendency for prices to vary from those on other markets, the supervisors sought to maintain the same prices and grades on different markets. This was sought to be achieved by instructions to buyers to change the prices bid or the percentages purchased, and such actions proved to be successful in maintaining and equalizing the prices on the different markets.

At a time when the manufacturers of lower priced cigarettes were beginning to manufacture them in quantity, the petitioners commenced to make large purchases of the cheaper tobacco leaves used for the manufacture of such lower priced cigarettes. No explanation was offered as to how or where this tobacco was used by petitioners. The compositions of their respective brands of cigarettes calling for the use of more expensive tobaccos remained unchanged during this period of controversy and up to the end of the trial. The Government claimed that such purchases of cheaper tobacco evidenced a combination and a purpose among the petitioners to deprive the man-

ufacturers of cheaper cigarettes of the tobacco necessary
for their manufacture, as well as to raise the price of
such tobacco to such a point that cigarettes made there-
from could not be sold at a sufficiently low price to compete
with the petitioners' more highly advertised brands.

## II.

The verdicts show also that the jury found that the
petitioners conspired to fix prices and to exclude unde-
sired competition in the distribution and sale of their
principal products.  The petitioners sold and distributed
their products to jobbers and to selected dealers who
bought at list prices, less discounts.  Almost all of the
million or more dealers who handled the respective peti-
tioners' products throughout the country consisted of such
establishments as small storekeepers, gasoline station
operators and lunch room proprietors who purchased the
cigarettes from jobbers.  The jobbers in turn derived
their profits from the difference between the wholesale
price paid by them and the price charged by them to
local dealers.  A great advantage therefore accrued to
any dealer buying at the discounted or wholesale list prices.
Selling to dealers at jobbers' prices was called "direct
selling" and the dealers as well as the jobbers getting
those prices were referred to as being on the "direct list."
The list prices charged and the discounts allowed by peti-
tioners have been practically identical since 1923 and abso-
lutely identical since 1928.  Since the latter date, only
seven changes have been made by the three companies
and those have been identical in amount.  The increases
were first announced by Reynolds.  American and
Liggett thereupon increased their list prices in identical
amounts.

The following record of price changes is circumstantial
evidence of the existence of a conspiracy and of a power
and intent to exclude competition coming from cheaper

grade cigarettes. During the two years preceding June, 1931, the petitioners produced 90% of the total cigarette production in the United States. In that month tobacco farmers were receiving the lowest prices for their crops since 1905. The costs to the petitioners for tobacco leaf, therefore, were lower than usual during the past 25 years, and their manufacturing costs had been declining. It was one of the worst years of financial and economic depression in the history of the country. On June 23, 1931, Reynolds, without previous notification or warning to the trade or public, raised the list price of Camel cigarettes, constituting its leading cigarette brand, from $6.40 to $6.85 a thousand. The same day, American increased the list price for Lucky Strike cigarettes, its leading brand, and Liggett the price for Chesterfield cigarettes, its leading brand, to the identical price of $6.85 a thousand. No economic justification for this raise was demonstrated. The president of Reynolds stated that it was "to express our own courage for the future and our own confidence in our industry." The president of American gave as his reason for the increase, "the opportunity of making some money." See 147 F. 2d 93, 103. He further claimed that because Reynolds had raised its list price, Reynolds would therefore have additional funds for advertising and American had raised its price in order to have a similar amount for advertising. The officials of Liggett claimed that they thought the increase was a mistake as there did not seem to be any reason for making a price advance but they contended that unless they also raised their list price for Chesterfields, the other companies would have greater resources to spend in advertising and thus would put Chesterfield cigarettes at a competitive disadvantage. This general price increase soon resulted in higher retail prices and in a loss in volume of sales. Yet in 1932, in the midst of the national depression with the sales of the petitioners' cigarettes falling off greatly in number, the

petitioners still were making tremendous profits as a result of the price increase. Their net profits in that year amounted to more than $100,000,000. This was one of the three biggest years in their history.

Before 1931, certain smaller companies had manufactured cigarettes retailing at 10 cents a package, which was several cents lower than the retail price for the leading brands of the petitioners. Up to that time, the sales of the 10 cent cigarettes were negligible. However, after the above described increase in list prices of the petitioners in 1931, the 10 cent brands made serious inroads upon the sales of the petitioners. These cheaper brands of cigarettes were sold at a list price of $4.75 a thousand and from 1931 to 1932 the sales of these cigarettes multiplied 30 times, rising from 0.28% of the total cigarette sales of the country in June, 1931, to 22.78% in November, 1932. In response to this threat of competition from the manufacturers of the 10 cent brands, the petitioners, in January, 1933, cut the list price of their three leading brands from $6.85 to $6 a thousand. In February, they cut again to $5.50 a thousand. The evidence tends to show that this cut was directed at the competition of the 10 cent cigarettes. Reports that previously had been sent in by various officials and representatives to their companies told of the petitioners' brands losing in competition with the 10 cent brands. The petitioners were interested in a sufficiently low retail price for their products so that they would defeat the threat from the lower priced cigarettes and found that, in order to succeed in their objective, it was necessary that there be not more than a 3 cent differential on each package at retail between the cheaper cigarettes and their own brands. The petitioners' cuts in their list prices and the subsequent reductions in the retail prices of their products resulted in a victory over the 10 cent brands. The letters of petitioners' representatives to their companies reported upon the progress of

this battle, giving an account of the decline in sales of the 10 cent brands because of the price reductions in the "15-cent brands," and prophesying that certain of the 10 cent brands would "pass out of the picture." Following the first price cut by petitioners, the sales of the 10 cent brands fell off considerably. After the second cut they fell off to a much greater extent. When the sale of the 10 cent brands had dropped from 22.78% of the total cigarette sales in November, 1932, to 6.43% in May, 1933, the petitioners, in January, 1934, raised the list price of their leading brands from $5.50 back up to $6.10 a thousand. During the period that the list price of $5.50 a thousand was in effect, Camels and Lucky Strikes were being sold at a loss by Reynolds and American. Liggett at the same time was forced to curtail all of its normal business activities and cut its advertising to the bone in order to sell at this price. The petitioners, in 1937, again increased the list prices of their above named brands to $6.25 a thousand and in July, 1940, to $6.53 a thousand.

Certain methods used by the petitioners to secure a reduction in the retail prices of their cigarettes were in evidence. Reynolds and Liggett required their retailers to price the 10 cent brands at a differential of not more than 3 cents below Camel and Chesterfield cigarettes. They insisted upon their dealers correcting a greater differential by increasing the retail price of the 10 cent brands to 11 cents with petitioners' brands at 14 cents a package, or by requiring that petitioners' brands be priced at 13 cents with the lower priced cigarettes at 10 cents a package. Salesmen for Liggett were instructed to narrow the differential to 3 cents, it being deemed of no consequence whether the dealer raised the price of the 10 cent brands or reduced the price of Chesterfields. Reynolds referred to a differential of more than 3 cents as "discriminatory" on the ground that the dealer then

would make a higher gross profit on the higher priced cigarettes than on the 10 cent brands. After the list price reductions were made and at the height of the price war, the petitioners commenced the distribution of posters advertising their brands at 10 cents a package and made attempts to have dealers meet these prices. Among the efforts used to achieve their objectives, petitioners gave dealers direct list privileges of purchase, together with discounts, poster advertising displays, cash subsidies and free goods. In addition to the use of these inducements, petitioners also used threats and penalties to enforce compliance with their retail price program, removed dealers from the direct lists, cancelled arrangements for window advertising, changed credit terms with a resulting handicap to recalcitrant dealers, discontinued cash allowances for advertising, refused to make deals giving free goods, and made use of price cutters to whom they granted advantageous privileges to drive down retail prices where a parity, or price equalization, was not maintained by dealers between brands of petitioners or where the dealers refused to maintain the 3 cent differential between the 10 cent brands and the leading brands of petitioners' cigarettes. There was evidence that when dealers received an announcement of the price increase from one of the petitioners and attempted to purchase some of the leading brands of cigarettes from the other petitioners at their unchanged prices before announcement of a similar change, the latter refused to fill such orders until their prices were also raised, thus bringing about the same result as if the changes had been precisely simultaneous.

## III.

It was on the basis of such evidence that the Circuit Court of Appeals found that the verdicts of the jury were sustained by sufficient evidence on each count. The question squarely presented here by the order of this

Court in allowing the writs of certiorari is whether actual exclusion of competitors is necessary to the crime of monopolization in these cases under § 2 of the Sherman Act. We agree with the lower courts that such actual exclusion of competitors is not necessary to that crime in these cases and that the instructions given to the jury, and hereinbefore quoted, correctly defined the crime. A correct interpretation of the statute and of the authorities makes it the crime of monopolizing, under § 2 of the Sherman Act, for parties, as in these cases, to combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several states or with foreign nations, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power. See *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 226, n. 59 and authorities cited.

It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course

of dealing or other circumstances as well as in an exchange of words. *United States* v. *Schrader's Son,* 252 U. S. 85. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified. Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.

In *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 496, this Court said in a footnote, "On finding . . . a power to control the output, supply of the market and the transportation facilities of potential competitors, in the anthracite coal market, the arrangement was held void in *United States* v. *Reading Co.,* 253 U. S. 26, 47–48." It has been held that regardless of the use made of it, a power resulting from the deliberately calculated purchase of a control, which enables a holding company to dominate two great competing interstate railroad carriers and two great competing coal companies engaged extensively in mining and selling anthracite coal which must be distributed over these railroads, is a menace and an undue restraint upon interstate commerce within the meaning of the Anti-Trust Act and is in flagrant violation of the prohibition against monopoly in the Second Section of that Act. *United States* v. *Reading Co.,* 253 U. S. 26. In *Northern Securities Co.* v. *United States,* 193 U. S. 197, in referring to the holding company device there in issue, this Court said that the mere existence of such a combination and the power acquired by the holding company as its trustee constituted a menace to and a direct restraint upon that freedom of commerce which Congress intended to recognize and protect and which the public is entitled to have

protected. A combination may be one in restraint of interstate trade or commerce or to monopolize a part of such trade or commerce in violation of the Sherman Act, although such restraint or monopoly may not have been actually attempted to any harmful extent. See *United States* v. *International Harvester Co.*, 214 F. 987, *id.*, 274 U. S. 693. The authorities support the view that the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so. *United States* v. *American Tobacco Co.*, 164 F. 700, 721, remanded for further proceedings, 221 U. S. 106, 188. "It is undoubtedly true . . . that trade and commerce are 'monopolized' within the meaning of the federal statute, when, as a result of efforts to that end, such power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce. It is not necessary that the power thus obtained should be exercised. Its existence is sufficient." *United States* v. *Patten,* 187 F. 664, 672, reversed on other grounds, 226 U. S. 525. Cf. *North American Co.* v. *S. E. C.,* 327 U. S. 686.

The precise question before us has not been decided previously by this Court. However, on March 12, 1945, two weeks before the grant of the writs of certiorari in the present cases, a decision rendered in a suit in equity brought under §§ 1 and 2 of the Sherman Anti-Trust Act against the Aluminum Company of America closely approached the issue we have here. That case was decided by the Circuit Court of Appeals for the Second Circuit under unique circumstances which add to its weight as a precedent. *United States* v. *Aluminum Co. of America,* 148 F. 2d 416. That court sat in that case under a new statute authorizing it to render a decision "in lieu of a

decision by the Supreme Court" and providing that such decision "shall be final and there shall be no review of such decision by appeal or certiorari or otherwise." [10]

---

[10] "In every suit in equity brought in any district court of the United States under any of said Acts [including the Sherman Anti-Trust Act], wherein the United States is complainant, an appeal from the final decree of the district court will lie only to the Supreme Court and must be taken within sixty days from the entry thereof: *Provided, however,* That if, upon any such appeal, it shall be found that, by reason of disqualification, there shall not be a quorum of Justices of the Supreme Court qualified to participate in the consideration of the case on the merits, then, in lieu of a decision by the Supreme Court, the case shall be immediately certified by the Supreme Court to the circuit court of appeals of the circuit in which is located the district in which the suit was brought which court shall thereupon have jurisdiction to hear and determine the appeal in such case, and it shall be the duty of the senior circuit judge of said circuit court of appeals, qualified to participate in the consideration of the case on the merits, to designate immediately three circuit judges of said court, one of whom shall be himself and the other two of whom shall be the two circuit judges next in order of seniority to himself, to hear and determine the appeal in such case and it shall be the duty of the court, so comprised, to assign the case for argument at the earliest practicable date and to hear and determine the same, and the decision of the three circuit judges so designated, or of a majority in number thereof, shall be final and there shall be no review of such decision by appeal or certiorari or otherwise. . . ." 32 Stat. 823, as amended by 58 Stat. 272, 15 U. S. C. Supp. IV, § 29.

The proviso in the above section was added by Public Law 332, 78th Cong., 2d Sess., approved June 9, 1944, which also made the Act applicable "to every case pending before the Supreme Court of the United States on the date of its enactment." 58 Stat. 272. The case against the Aluminum Company of America was then pending in this Court and, on June 12, 1944, this Court certified it to the Circuit Court of Appeals for the Second Circuit because of the lack of a quorum of Justices of the Supreme Court qualified to participate in the consideration of it on its merits. It was tried before the three senior judges of the Circuit Court of Appeals (Judges Learned Hand, Swan and Augustus N. Hand) and is the only case that has been tried under that proviso.

We find the following statements from the opinion of the court in that case to be especially appropriate here and we welcome this opportunity to endorse them:

> "Many people believe that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone. . . . These considerations, which we have suggested only as possible purposes of the Act, we think the decisions prove to have been in fact its purposes. [148 F. 2d at 427.]

> .        .        .        .        .

> "Starting, however, with the authoritative premise that all contracts fixing prices are unconditionally prohibited, the only possible difference between them and a monopoly is that while a monopoly necessarily involves an equal, or even greater, power to fix prices, its mere existence might be thought not to constitute an exercise of that power. That distinction is nevertheless purely formal; it would be valid only so long as the monopoly remained wholly inert; it would disappear as soon as the monopoly began to operate; for, when it did—that is, as soon as it began to sell at all—it must sell at some price and the only price at which it could sell is a price which it itself fixed. Thereafter the power and its exercise must needs coalesce. Indeed it would be absurd to condemn such contracts unconditionally, and not to extend the condemnation to monopolies; for the contracts are only steps toward that entire control which monopoly confers: they are really partial monopolies. [*Id.* 427–428.]

> .        .        .        .        .

> "It does not follow because 'Alcoa' had such a monopoly, that it 'monopolized' the ingot market: it may not have achieved monopoly; monopoly may have been thrust upon it. If it had been a combination of existing smelters which united the whole indus-

try and controlled the production of all aluminum ingot, it would certainly have 'monopolized' the market. In several decisions the Supreme Court has decreed the dissolution of such combinations, although they had engaged in no unlawful trade practices. . . . We may start therefore with the premise that to have combined ninety per cent of the producers of ingot would have been to 'monopolize' the ingot market; and, so far as concerns the public interest, it can make no difference whether an existing competition is put an end to, or whether prospective competition is prevented. The Clayton Act itself speaks in that alternative: 'to injure, destroy, or prevent competition.' § 13 (a), 15 U. S. C. A. [*Id.* 429.]

.         .         .         .         .

"It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to manoeuvres not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent. [*Id.* 431.]

.         .         .         .         .

"In order to fall within § 2, the monopolist must have both the power to monopolize, and the intent to monopolize. To read the passage as demanding any 'specific' intent, makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing." [*Id.* 432.]

In the present cases, the petitioners have been found to have conspired to establish a monopoly and also to have the power and intent to establish and maintain the mo-

nopoly. To hold that they do not come within the pro-
hibition of the Sherman Act would destroy the force of
that Act. Accordingly, the instructions of the trial court
under § 2 of the Act are approved and the judgment of
the Circuit Court of Appeals is

*Affirmed.*[11]

MR. JUSTICE FRANKFURTER entirely agrees with the
judgment and the opinion in these cases. He, however,
would have enlarged the scope of the orders allowing the
petitions for certiorari so as to permit consideration of
the alleged errors in regard to the selection of the jury.

MR. JUSTICE REED and MR. JUSTICE JACKSON took no
part in the consideration or decision of these cases.

MR. JUSTICE RUTLEDGE, concurring.

I concur in the Court's opinion and judgment. In doing
so, however, I express no judgment concerning other ques-
tions determined on the appeal to the Circuit Court of
Appeals, 147 F. 2d 93, and presented in the application
for certiorari or the later petition for rehearing and en-
largement of the scope of review here, including the ques-
tion whether upon the particular facts the law has been
applied in such a manner as to bring about, in substantial
effect, multiple punishment for the same offense. Cf.
*Pinkerton* v. *United States, ante,* pp. 640, 648, dissenting
opinion.

[11] Upon suggestion of the death of Edward H. Thurston, a petitioner
in case No. 19, a motion to dismiss the writ of certiorari as to him
was granted by the Court on February 11, 1946, 327 U. S. 764. It
remains for the Circuit Court of Appeals and the District Court of
the United States for the Eastern District of Kentucky to take such
further action as law and justice may require. See *Singer* v. *United
States,* 323 U. S. 338, 346; *United States* v. *Johnson,* 319 U. S. 503,
520.

That question has been discussed in the briefs and the argument, for its bearing upon the disposition of the single question which certiorari was granted to review, namely, "whether actual exclusion of competitors is necessary to the crime of monopolization under § 2 of the Sherman Act." 324 U. S. 836. On this issue I have no doubt of the correctness of the Court's conclusion that the offense of monopolization is complete when power is acquired to exclude competitors and therefore that actual exclusion need not be shown, for the reasons set forth in the opinion. Whether, in this view, multiple punishment may arise upon application of the law to particular facts under counts charging conspiracy in restraint of trade, monopolization, and conspiracy to monopolize presents a different question which can be determined only by examination of the manner in which the particular application has been made. Since, in view of the limited character of our action in granting certiorari, neither the issue of multiple punishment nor the facts of record upon which it arises are before us for review, it would be inappropriate to express opinion on that question.