**DANKESE ENGINEERING, INC., Plaintiff,**

v.

**IONICS, INC., and American Research and Development Corp., Defendants.**

**Civ. A. No. 72–3901–C.**

United States District Court, D. Massachusetts.

March 28, 1979.

---

Ralph Warren Sullivan, Malloy & Sullivan, Hingham, Mass., for Dankese Engineering, Inc.

Laura S. Steinberg, Sullivan & Worcester, Boston, Mass., for Ionics, Inc.

Jerome P. Facher, Hale & Dorr, Boston, Mass., for American Research & Development Corp.

## OPINION

CAFFREY, Chief Judge.

Plaintiff brought suit in 1972 alleging that defendant Ionics, Inc. (Ionics) had attempted to monopolize the dairy and cheese whey[1] desalting market by thwarting the introduction of plaintiff's product into that market in violation of 15 U.S.C.A. § 2; and that Ionics conspired with defendant American Research and Development Corp. (ARD) to restrain plaintiff from entering that market by restraining the introduction of plaintiff's products into the market in violation of 15 U.S.C.A. § 1.

Separate motions for summary judgment were filed by the defendants and pursuant to 28 U.S.C.A. § 636(b)(1)(B) the matters were referred to a magistrate for his recommendation for disposition. After a hearing in September, 1977 the magistrate recommended that both motions be allowed and judgments be entered for the defendants. Plaintiff filed its objections to the recommendations of the magistrate and a hearing was held by another judge of this court in April, 1978. Thereafter, the case was reassigned to the writer hereof. The following are the facts taken in the light most favorable to the plaintiff for purposes of these motions.

Ionics is a major supplier of electrodialysis (ED) membranes and equipment for the desalting of cheese whey[2] supplying approximately 67% of the membrane equipment used to desalt cheese whey worldwide and approximately 90% in the United States. Ionics does not and has never manufactured reverse-osmosis (RO) or ultra-filtration (UF) membranes.

According to an affidavit submitted on behalf of plaintiff RO–UF and ED are competitive processes but whereas ED is limited to desalting, RO–UF "desalts, concentrates and fractionizes on a selected molecular weight basis and unlike electrodialysis it removes harmful bacteria, viruses and pyrogens."

ARD is a corporation engaged in the business of supplying venture capital for the manufacture and commercial marketing of high technology products. In 1971 ARD owned 26% of Ionics.

In 1971 plaintiff had developed RO–UF membranes which it was interested in marketing. Seeking $220,000 in investment capital, plaintiff's president Joseph Dankese submitted a business presentation to ARD in which an opportunity for ARD to finance the manufacture and marketing of plaintiff's proprietary RO–UF membranes was outlined. ARD's vice president Charles Coulter told Mr. Dankese that Ionics was interested in RO–UF equipment and asked Mr. Dankese to contact Ionics. However, it was the president of Ionics, Arthur Goldstein, that eventually contacted Mr. Dankese and Mr. Dankese and Mr. Goldstein met on November 30, 1971. Mr. Dankese did not submit plaintiff's business presentation to Ionics at that time.

On December 3, 1971, Mr. Dankese was informed by Mr. Coulter that if Ionics should test plaintiff's membranes and be-

---

1. Cheese whey is a by-product from the manufacture of cheese which is composed of water, organics and dissolved ionized material.

2. In electrodialysis the ionized material passes through the membrane and the desalted organics and water are left behind.

come interested in developing them that ARD would be willing to fund Ionics and that it would be up to plaintiff to work out an arrangement with Ionics. He further stated that he would not be in favor of funding plaintiff directly if Ionics were entering the same field but that ARD's president, General George Doriot, might be.

In January, 1972 plaintiff sent to Ionics the same business proposal it had already submitted to ARD. On February 28, 1972 plaintiff received an unsatisfactory counter proposal from Ionics and requested the return of its presentation. It was returned.

On March 7, 1972 plaintiff contacted Ionics and agreed that Ionics could test the RO–UF membranes in the presence of Mr. Dankese. Ionics agreed not to disclose any proprietary information about plaintiff's product which it acquired during the testing.

Plaintiff alleges, and for purposes of this motion the Court will assume, that the people conducting the testing were inexperienced in analyzing RO–UF membranes, that all membranes were tested with raw cheese whey, that analyses were incomplete and inconsistent, and that all raw data was not made available to Dankese. Plaintiff also alleges that its president continually complained to Goldstein of delays and inadequacies in the testing procedure.

The tests were completed in May, 1972, and on May 16, 1972 Mr. Goldstein of Ionics informed plaintiff that it had found that plaintiff's RO–UF membranes were not superior to others available in the market and that Ionics was not interested in entering an agreement with plaintiff.

On May 17, 1972 Mr. Coulter of ARD told plaintiff that no direct funding of plaintiff would be considered until ARD heard from Ionics as to whether Ionics was still interested in plaintiff's product. Upon its receipt of the Ionics' opinion, ARD decided not to invest in plaintiff's venture and plaintiff has been unable to receive funding from other sources.

Plaintiff bases its claim that the two corporations combined or conspired to restrain plaintiff from introducing its product into the relevant market, in violation of 15 U.S.C.A. § 1, on that disclosure by Ionics to ARD of its adverse opinion as to plaintiff's membranes.

Mr. Goldstein testified that, although he informed ARD that Ionics was no longer interested in plaintiff's business presentation, the raw data from the tests was not released to anyone and plaintiff produced no evidence to the contrary. Even if the data had been disclosed to ARD, however, it would not have violated the agreement between plaintiff and Ionics as to the release of proprietary information because that agreement cannot be considered to apply to ARD.

That ARD would be privy to the test results was implicit in the three-party relationship described by plaintiff. It was ARD that first expressed interest in plaintiff's product and encouraged Ionics to contact plaintiff. ARD's vice-president, Mr. Coulter, discussed with Mr. Dankese the possibility of ARD's funding a joint RO–UF effort between plaintiff and Ionics. Mr. Dankese was informed that General Doriot of ARD might be interested in funding plaintiff's product directly in the absence of participation by Ionics and Mr. Coulter testified in deposition that ARD did in fact fund companies which competed with its portfolio companies. Were ARD to consider funding plaintiff directly, it would naturally consider the opinion of its associate company which was an expert in the membrane field.

■ Since plaintiff's allegations against ARD are supported solely by ARD's reliance on Ionics, defendant ARD is entitled to summary judgment. In addition, plaintiff points to no actions by Ionics beyond its disclosure to ARD to support its Section 1 claim and because Ionics cannot conspire with itself, Ionics is also entitled to summary judgment on that claim.

■ Turning now to the plaintiff's attempted monopoly claim under 15 U.S.C.A. § 2, plaintiff would be required at trial to establish the existence of both monopoly

power and an intent to monopolize in order to be successful. *Whitten v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975), citing *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). The presence of these two essential elements cannot be determined out of context. Therefore, it is necessary to determine the identity of the relevant market before one can determine whether both monopoly power and intent to monopolize exist within that market. *Whitten, supra.*

■ Plaintiff has at different points in this case framed its allegation in terms of three different markets

   (i) the liquid (including cheese whey) desalination market

   (ii) the cheese whey processing market

   (iii) the cheese whey desalination market.

The Court will discuss the factual allegations in the light most favorable to the plaintiff as they apply to each of these three markets.

In *United States v. E. I. DuPont DeNemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994 (1956), the Supreme Court defined monopoly power as "the power to control prices or exclude competition." If the relevant market is the liquid (including cheese whey) desalination market, no facts have been alleged nor has any evidence been adduced tending to prove that Ionics had such power in that market. The unrebutted testimony of Mr. Goldstein establishes merely that Ionics participates in that market.

Similarly if the relevant market is the cheese whey processing market plaintiff has not alleged any facts or presented any evidence tending to establish that Ionics had monopoly power in that market in 1971–72. Although Mr. Goldstein testified in deposition that ED was the only membrane which had penetrated the cheese whey processing market with any degree of success, he did not testify as to what portion of that market ED had acquired and thus no calculation of Ionics' portion therein may be made. As to the first two potentially relevant markets, therefore, plaintiff has failed after seven years and extensive discovery to support its allegations of monopoly sufficiently to withstand a motion for summary judgment.

Closer scrutiny is required, however, as to the third market, the market for the desalination of cheese whey. Mr. Goldstein testified that Ionics controls 90% of the market for membranes and membrane equipment used to desalt cheese whey in the United States. Since the affidavit of Mr. Dankese states that RO–UF membranes may be used to desalt,[3] for purposes of this motion RO–UF membranes must be considered competitors of ED within the market for the desalination of cheese whey in which Goldstein concedes Ionics has a 90% share.

■ Although market share alone does not determine the presence of monopoly power, *Pacific Coast Agricultural Export Assoc. v. Sunkist Growers, Inc.,* 526 F.2d 1196 (9th Cir. 1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976), a 90% market share gives rise to a reasonable inference that the entity having such a large portion of the market may exert its power to exclude competition and control prices. *See United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Accordingly in our analysis of plaintiff's Section 2 claim, for purposes of this motion it will be assumed that Ionics has monopoly power in the market for the desalination of cheese whey. It therefore becomes necessary to examine the support for plaintiff's allegations that Ionics' actions were intended to exclude plaintiff from the market.

Ionics has supported its motion for summary judgment with evidence that no information about plaintiff's product was disclosed to anyone beyond the opinion expressed by Ionics to ARD has already been discussed. Plaintiff has submitted no con-

---

**3.** Although the affidavit does not specifically state that the membranes desalt cheese whey, it will be so interpreted in the light most favorable to plaintiff.

**154**

trary evidence. In addition, all of the evidence before the Court supports a finding that Ionics' refusal to deal with the plaintiff was based on the results of its tests. Since intent is the key question whether or not the testing process was adequate is immaterial. There is no evidence presented by plaintiff to support its allegation that Ionics acted with an improper motive.

■ Although in 1961 the Supreme Court expressed a reluctance to affirm summary judgments in complex antitrust litigation "where motive and intent play leading roles . . . ." *Poller v. Columbia Broadcasting Systems, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458, summary judgments may, on occasion, be granted in such cases. *See First National Bank v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The only matters in the record which arguably support plaintiff's contentions are the contentions themselves. Consisting, as they do, of disgruntled self-serving statements by Mr. Dankese, I rule that in the absence of any evidence tending to support or corroborate his claims that there is no issue of material fact presented as to the plaintiff's third market claims. As in *Raitport v. Chase Manhattan Capital Corp.,* 388 F.Supp. 1095 (S.D.N.Y.1975), the plaintiff here offers no expert testimony to supplement his own opinion nor does he indicate that any testimony will be available beyond his own speculations as to the intent of the defendants. Judgment should enter for the defendant Ionics on the Section 2 claim.

■ Turning to plaintiff's state law claim against Ionics and ARD for maliciously interfering with plaintiff's advantageous business position, the only disclosure evidenced by the record regarding plaintiff's property was the previously discussed disclosure by Ionics to ARD. There is no evidence that plaintiff was in an advantageous position with ARD. It had merely applied to ARD for financing and was not assured of such funding even if the testing results were excellent. I rule that both defendants are entitled to summary judgment.