LAWLOR et al. v. NATIONAL SCREEN SERVICE CORP. et al.

LIPP v. NATIONAL SCREEN SERVICE CORP. et al.

SIEGEL v. NATIONAL SCREEN SERVICE CORP. et al.

SCHRADER v. NATIONAL SCREEN SERVICE CORP. et al.

Civ. Nos. 10020, 11136–11138.

United States District Court
E. D. Pennsylvania.
July 25, 1951.

Francis T. Anderson, Philadelphia, Pa.,. for all plaintiffs.

Louis Nizer, New York City, for defendant National Screen Service Corp.

Morris Wolf, and Abraham L. Freedman,. Philadelphia, Pa., for defendant Warner Bros. Pictures Distributing Corp.

Earl G. Harrison, Philadelphia, Pa., for defendants Columbia Pictures Corp.,. Loew's Incorporated, Paramount Film Distributing Corp., RKO Radio Pictures, Inc.,. Twentieth Century-Fox Film Corp., United Artists Corp., Universal Film Exchanges, Inc.

McGRANERY, District Judge.

Four actions seeking treble damages and' injunctive relief under the Sherman and. Clayton Anti-Trust Acts, 15 U.S.C.A. §§ 1–7 and 12–27, have been filed by separate plaintiffs against the defendants. In each case plaintiffs have moved for summary judgment on the injunctive phase of their actions. It has been stipulated that affidavits relating to the motion filed in any of the actions shall be a part of the record in all the actions, and the motions. were argued as a unit. Hence, they will be considered together.

Plaintiffs and defendant National Screen Service Corporation (hereafter referred to as National Screen) are in the business of servicing exhibitors of motion pictures with advertising materials. The plaintiffs, whose operations are centered in the Philadelphia, Chicago, Washington, D. C. and Charlotte, N. C. areas respectively, deal in only signs and posters known as standard accessories, embodying copyrighted materials from motion pictures. The defendant National Screen, operating on a nation-wide scale, deals not only in standard accessories, but also specialty accessories (a more elaborate type of display) and trailers (or "prevues"). At various times between 1939 and 1947, the other defendants or their affiliates [1] (hereafter referred to as the producer-distributor defendants) entered into agreements with National Screen granting it the exclusive license to manufacture and distribute standard accessories [2] to their motion picture films on a royalty basis. Affidavits of the producer-distributor defendants recite that the motivation for entering into the contracts with National Screen was their dissatisfaction with the manner in which they had been able to handle the accessory function themselves. Service to exhibitors had frequently been inefficiently performed; the war had increased space and manpower problems; and generally the business had been unprofitable, resulting in substantial losses. National Screen was the only existing concern qualified to take over and perform those services for the producer-distributors. They indicate complete satisfaction with the services performed under the licensing agreements. Not only were they relieved of the "headaches" connected with the business, but losses were converted into profits by virtue of royalties received from National Screen. The justification advanced for the exclusive nature of the agreements is that the type of service required demanded a complete, nation-wide distribution organization and National Screen was hence obliged to undertake a great expansion of its facilities which required substantial investment of money.

In 1942 an anti-trust suit was brought in this district by some of the present plaintiffs against some of the present defendants. The action was settled by the execution of sub-license agreements between National Screen and those plaintiffs. All of the present plaintiffs are currently being supplied with standard accessories under sub-licenses.

The plaintiffs contend that National Screen has acquired an unlawful monopoly of the business of distributing standard advertising accessories, in violation of Section 2 of the Sherman Act, and that all defendants have conspired to create the monopoly, in violation of Sections 1 and 2 of the Act.[3]

At the outset it must be noted that the producer-distributor defendants and

1. Three of the defendants, Paramount Film Distributing Corporation, Universal Film Exchanges, Inc., and Warner Bros. Pictures Distributing Corporation, who do not produce but only distribute films, have not themselves entered into contracts with National Screen; the contracts relevant to them were entered into by their respective producer affiliates. The remaining defendants contracted directly with National Screen: Columbia Pictures Corporation, Loew's Incorporated, RKO Pictures, Inc., Twentieth Century-Fox Film Corporation and United Artists Corporation. These defendants, with the exception of United Artists, both produce and distribute films; the latter is exclusively a distributory of motion pictures produced by independent producers.

2. The various contracts also grant National Screen exclusive privileges with respect to the manufacture and distribution of specialty accessories and, except for Warner and Loew's pictures, trailers. The plaintiffs have never manufactured nor do they desire to manufacture any accessories, and their sole interest in distribution is confined to standard accessories. The charge of monopoly, therefore, is based only on the business of distributing standard accessories.

3. " * * * [T]he two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, note 59 at page 226, 60 S.Ct. 811, 846, 84 L.Ed. 1129.

184

their subsidiary or affiliated corporations —the so-called "big eight", produce and distribute virtually all the commercial motion picture films in the United States.[4] Hence, one who controls the distribution of standard accessories advertising those pictures necessarily controls the standard accessory market. National Screen contends, in the first place, that the relevant market is the whole motion picture advertising business, of which the accessory and trailer field is a very small part; and secondly, that plaintiffs have no standing to complain of any injury because they have failed to prove, or even assert, that they ever possessed the intention or were prepared to manufacture and distribute, on a nation-wide scale, standard accessories, specialty accessories and trailers—the scope of National Screen's enterprise. American Banana Co. v. United Fruit Co., 2 Cir., 166 F. 261, affirmed 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826; Triangle Conduit & Cable

Co. v. National Electric Products Corp., 3 Cir., 152 F.2d 398. The relevant market may be highly particularized, both geographically and in terms of the part of an industry involved. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010;[5] United States v. National City Lines, 7 Cir., 186 F.2d 562; Goldman Theatres v. Loew's, Inc., 3 Cir., 150 F.2d 738. Consequently, if the plaintiffs are competing in the substantial interstate commerce of distributing standard accessories, even though on a relatively local scale, they have standing to claim injunctive relief against threatened harm if that commerce is being restrained or monopolized. It is not denied that the plaintiffs are so competing—although the nature of that competition is at issue in the case; and it is established that the distribution of standard accessories is a substantial business [6] in interstate commerce.[7] It is, therefore,

4. It appears that there are only twelve corporations in the United States who are engaged in the business of distributing feature motion pictures on a national scale: The eight defendants in these actions, plus Eagle Lion Films, Inc., Film Classics, Inc., Monogram Distributing Corporation, and Republic Pictures Corporation. There are no figures in evidence which establish the percentage of the market occupied by the eight defendants, but plaintiff Pantzer's affidavit stating that the present defendants, or their subsidiary or affiliated corporations, produce and distribute virtually all of the commercially significant motion picture films exhibited in the United States, is not denied. Nor do the defendants contend or make any attempt to establish as a fact that the eight producer-distributors do not control such a portion of the market of motion pictures that their combined standard accessory business constitutes a monopoly of that business.

[3] 5. At p. 225, of 332 U.S., at page 1564 of 67 S.Ct., 91 L.Ed. 2010: " * * * § 2 of the Act makes it unlawful to conspire to monopolize 'any part' of interstate commerce, without specifying how large a part must be affected. Hence it is enough if some appreciable part of interstate commerce is the subject of a monoply, a restraint or a conspiracy."

6. In the year 1949 the amount of gross revenue received by National Screen from

motion picture exhibitors, serviced by its Philadelphia branch office, by virtue of the sale, lease or rental of standard accessories, was $149,116.25.

[4] 7. The distribution of motion pictures by the eight producer-distributor defendants is clearly interstate commerce, United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, and the distribution of standard accessories, containing copyrighted material from the films, is closely connected with and highly analogous to the distribution of the films. Before National Screen's appearance in the picture, the posters were manufactured by the producers and distributed in the same manner as the films themselves, through the film exchanges. Now they are produced by National Screen, with certain materials and supervision being furnished by the producer-distributors; the posters are then shipped by National Screen to its branch offices located in more than thirty cities throughout the United States (the same cities in which the motion picture distributors' film exchanges are located), or to one of the independent poster-renters located in the same cities; from each of these points the materials are rented to the same exhibitors to whom the film exchange offices in the same city rent the films themselves. At no place in the defendants' answers is there a clear-cut admission that the poster-distribution business is interstate

of no significance that the plaintiffs are not prepared to manufacture standards, specialties and trailers, or to distribute specialties and trailers, or to do business outside their local territories. They are entitled to be secure against monopoly in their local businesses of distributing standard accessories.

█ █ On the question of illegal monopoly in the standard accessory field, it is necessary to determine first, whether National Screen possesses monopoly power. "The authorities support the view that the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so." American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575. By virtue of its exclusive contracts with the eight other defendants (or their affiliates), National Screen has the power to remove plaintiffs from competition by refusing to supply them under the sub-license agreements, or by refusing to renew those agreements at their expiration.[8] Whatever competition exists in the distribution of the standard accessories of the films of the eight producer-distributor defendants, which constitute substantially the entire market, exists only at the sufferance of National Screen. " * * * [T]he mere existence of monopoly power, though not exercised abusively, is some indication of illegality. A violation of the statute will come to completion if the defendant has nothing more than a purpose or intent to exercise the power, American Tobacco Co. v. United States, [supra]; United States

v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236, but as the cases show, a 'purpose or intent' is present if the acquisition or retention of the power comes about as a consequence of defendant's conduct or business arrangements. United States v. Griffith, 1948 [supra], 334 U.S. 100, 105–107, 68 S.Ct. 941–945, 92 L.Ed. 1236; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416." United States v. Aluminum Co. of America, D.C., 91 F.Supp. 333, 342.[9] No specific intent to monopolize is necessary; the only relevant intent is the intent to enter into the business arrangements which give rise to the power. By entering into exclusive agreements with the eight producer-distributor defendants (or their affiliates), National Screen has acquired the power to exclude competition and demonstrated its intent to exercise that power. Hence, it would appear that National Screen is in violation of Section 2 of the Sherman Act.

█ It should next be determined whether National Screen has actually exercised its power to exclude competition. There can be "no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to manoeuvres not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; * * *." United States v. Aluminum Co. of America, 2 Cir., 148

---

commerce. There is no attempt, in their affidavits, to deny the interstate nature of the business, and, the court does not entertain any doubt that the business is interstate commerce.

8. Or by servicing plaintiff's customers at prices much lower than those paid to National Screen by the plaintiffs themselves under the sub-licenses. The licensing agreements between National Screen and the producer-distributor defendants contain provisions whereby each licensor is protected from price discrim-

ination against its accessories in favor of the accessories of another producer, and there are also provisions whereby National Screen agrees not to exceed certain prices previously charged by the producer itself, except for the factor of rising costs. There is no provision requiring a minimum price to be charged, and National Screen could, if it chose, grossly undercut the plaintiffs.

9. Judge Knox' opinion contains an excellent summary of the law of monopoly under Section 2.

F.2d 416, 431. The words of Judge Learned Hand suggest with amazing accuracy some of National Screen's "exclusionary" activities. The exclusive nature of the original contracts between National Screen and the producer-distributors indicates, indeed, a manoeuvre "actuated solely by a desire to prevent competition." The renewal contracts [10] which are in terms "non-exclusive", demonstrate the same motivation. The producer-distributors agree not to produce or distribute advertising materials themselves, and their right to license anyone in addition to National Screen is made dependent on the assumption by such licensee of the obligation to operate as extensively in scope as does National Screen.[11] Inasmuch as National Screen is the only concern, other than the producer-distributors themselves, which has ever operated on such a scale—producing and distributing all three types of advertising materials on a nation-wide basis—potential competition is rendered impossible among existing business concerns. National Screen's sub-licenses to the plaintiffs also demonstrate the exercise of monopoly power to gain a competitive advantage in violation of the anti-trust laws. United States v. Griffith, supra. The agreements limit plaintiffs' operations geographically, in the source of supply they may utilize, and in the customers they may service. National Screen, therefore, not only possesses monopoly power and an intent to exercise that power, but it has in fact exercised the power. And by no stretch of the imagination can it be said that monopoly has been "thrust" upon National Screen unwittingly, or that it has passively achieved its position of pre-eminence. United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416. The story of its growth is the story of active planning deliberately undertaken and leading inevitably to monopoly. It is entirely irrelevant that there may have been no resort to unfair competitive practices. National Screen has monopolized the field of distributing standard accessories in violation of the law.

■■ The defendants argue that each of the producer-distributors could, in the conduct of their businesses, handle the production and distribution of their standard advertising accessories themselves, without the intervention of any middlemen, as indeed they formerly did; [12] and that, in the lawful exercise of an essential incident of their motion picture copyrights, each could have delegated the function to an exclusive licensee. The fact that they chose a common licensee, they urge, can make no difference, because the products themselves are non-competitive. That is, a poster advertising a particular Columbia picture is of no value in connection with a Paramount picture, or even with a different Columbia film. Thus, an exhibitor of one picture is not in the market for posters advertising any other picture. Therefore, it is contended, combining in one licensee the exclusive right to distribute posters for all pictures cannot reduce competition where none could have existed between separate licensees. United States v. Winslow, 227 U.S. 202, 33 S. Ct. 253, 57 L.Ed. 481; United States v. United Shoe Machinery Co., 247 U.S. 32,

10. All of the original contracts in effect at the time of the commencement of these actions have expired, except the Loew's contracts, which run to 1952. Four of the producer-distributor defendants have renewed their contracts with National Screen on a basis "non-exclusive" in terms: Columbia, RKO, Fox and Universal. There is not now on the record any contract between National Screen and Paramount, United Artists or Warner. It is not denied, however, that the latter three allow only National Screen to distribute standard accessories relating to their films, and it appears without denial that their operating policies remain the same as they were under the original contracts.

11. In RKO's contract, a breach of this condition gives National Screen the right to cancel the agreement.

12. The producer-distributor defendants' affidavits assert that it was their original policy to distribute standard accessories themselves, without the intervention of any middlemen. Three of these defendants deny categorically that plaintiffs were ever permitted to acquire accessories from them in order to service exhibitors, and one defendant admits furnishing accessories to plaintiffs.

38 S.Ct. 473, 62 L.Ed. 968. This argument is not supported by the facts. In the first place, it cannot be shown that the posters are intrinsically non-competitive.[13] Except in the type situation which presently prevails in National Screen's arrangements with exhibitors, whereby they are given standard accessory service generally for a flat fee, the products must certainly compete with each other for the exhibitor's advertising dollar. Even if the competitive nature of the posters is held to be a disputed issue of fact, or even if it is assumed that the products are non-competitive in nature, there are not sufficient bases for a conclusion that the field is incapable of being monopolized. Whether competition between posters exists or not, competition between poster-renters does exist, however restricted in nature. And the acquisition by National Screen of exclusive license agreements for the distribution of standard accessories of the "big eight" forecloses competition from a substantial market, a course of conduct unreasonable per se. International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20.

The plaintiffs, therefore, face the threat of the irreparable injury of exclusion from competition by National Screen's monopoly, and they are entitled to injunctive relief against the monopoly under Section 16 of the Clayton Act.

 The charge of conspiracy among all the defendants to create a monopoly is based on the fact of the existence of the exclusive contracts between National Screen and each of the eight producer-distributor defendants or their affiliates. No attempt is made to prove an express agreement. Of course, the law is well settled that "It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that

the defendants conformed to the arrangement." United States v. Paramount Pictures, 334 U.S. 131, 142, 68 S.Ct. 915, 922, 92 L.Ed. 1260; accord, Interstate Circuit v. United States, 306 U.S. 208, 226–227, 59 S.Ct. 467, 83 L.Ed. 610; Ball v. Paramount Pictures, Inc., 3 Cir., 169 F.2d 317, 319. "Uniform participation by competitors in a particular system of doing business where each is aware of the other's activities, the effect of which is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the statutes before us." Goldman Theatres v. Loew's, Inc., supra, 150 F.2d at page 745. The existence of the several exclusive license agreements is evidence of a uniform participation by competitors in a particular system of doing business, and the effect of that system is to create a monopoly in National Screen. Without additional evidence, it cannot be said that a conspiracy exists. The essence of conspiracy, in the absence of actual agreement, is scienter by the conspirators: a mutual awareness of each other's activities, a contemplated concert of action. There may be circumstances in which mutual knowledge should be inferred in the absence of specific proof. See Rostow, "Monopoly under the Sherman Act: Power or Purpose?" (43 Ill.Law Rev. 745, 781–785). Evidence of such circumstances is not available in these cases at this point of the proceedings. The affidavits submitted by the defendants clearly indicate that each producer-distributor entered into its agreement with National Screen independently, for legitimate business reasons related to its own enterprise; the contracts were entered into over a period of eight years, for varying periods of time, and they contained varying financial provisions which even now appear to be unknown to defendants not privy to a particular contract.[14] Of couse, if mutual awareness

---

13. Provisions in the various licensing agreements prevent National Screen from making price discriminations against one licensor's accessories in favor of another's. These provisions certainly indicate some degree of intrinsic competitiveness between posters advertising different films.

14. Plaintiffs, who acquired copies of the contracts from National Screen on discovery, were prohibited, by order of Judge Grim on National Screen's motion, from employing the full text of any of the financial terms and provisions of the license agreements between National

were actually present, it could not be explained away by such allegations of the "normal processes of competition * * *." United States v. Crescent Amusement Co., 323 U.S. 173, 183, 65 S.Ct. 254, 259, 89 L.Ed. 160. Perhaps proof of mutual awareness may be possible; nevertheless, from the development of the situation as described, it cannot be presumed. Plaintiffs point to various provisions in the licensing contracts which undoubtedly establish that each producer-distributor was aware that the others were also dealing with National Screen; and that much was admitted at the bar of the court during oral argument. Those contract provisions fall short of establishing that each knew the other was dealing with National Screen in such a manner that their combined action would necessarily run afoul of the law. In the answers to the complaints, the producer-distributor defendants deny knowledge of each other's contracts. The court has examined the record carefully and nowhere is the element of mutual awareness admitted or established. Consequently, on the issue of conspiracy, a disputed question of fact appears, precluding summary judgment.

The nature of the injunctive relief prayed is based upon the assumption of the existence of both monopoly and conspiracy, entailing a decree running against all defendants. Since, on summary judgment, monopoly, and not conspiracy, has been established, a decree can issue against monopoly by National Screen, but not against conspiracy by the producer-distributor defendants. Because of the intimate relationship of the latter to the problem of monopoly, it will be difficult to frame a suitable decree leaving these out of consideration. Nevertheless, the plaintiffs are entitled to a decree restraining National Screen from monopolizing the business of distributing standard accessories, so that they will be able to engage in that business under fair, competitive conditions. Rather than issue a

Screen and its licensors, or from otherwise revealing any of the terms and conditions. Plaintiffs were permitted, however, to use, in lieu of the deleted financial

decree now, the court feels that it would be more advisable to permit the parties to submit proposed terms for a decree and to hear argument on them. Accordingly, it will be so ordered.

terms, a summary of those terms setting forth the various methods by which royalties are determined.