238 F.2d 59
 Charles LAWLOR et al., Appellants,
v.
NATIONAL SCREEN SERVICE CORPORATION.
Morris J. LIPP, etc., Appellant,
v.
NATIONAL SCREEN SERVICE CORPORATION.
Benjamin SIEGEL, etc., Appellant,
v.
NATIONAL SCREEN SERVICE CORPORATION.
Jay SCHRADER, etc., Appellant,
v.
NATIONAL SCREEN SERVICE CORPORATION.
Dave MITCHEL, etc., Appellant,
v.
NATIONAL SCREEN SERVICE CORPORATION.
Jacob RIFF, Appellant,
v.
NATIONAL SCREEN SERVICE CORPORATION.
Harry VOGELSTEIN, etc., Appellant,
v.
NATIONAL SCREEN SERVICE CORPORATION.
Charles LAWLOR et al.,
v.
NATIONAL SCREEN SERVICE CORPORATION, Appellant.
Morris J. LIPP, etc.,
v.
NATIONAL SCREEN SERVICE CORPORATION, Appellant.
Benjamin SIEGEL, etc.,
v.
NATIONAL SCREEN SERVICE CORPORATION, Appellant.
Jay SCHRADER, etc.,
v.
NATIONAL SCREEN SERVICE CORPORATION, Appellant.
Dave MITCHEL
v.
NATIONAL SCREEN SERVICE CORPORATION, Appellant.
Jacob RIFF
v.
NATIONAL SCREEN SERVICE CORPORATION, Appellant.
Harry VOGELSTEIN
v.
NATIONAL SCREEN SERVICE CORPORATION, Appellant.
 Nos. 11818-11831.
 United States Court of Appeals Third Circuit.
 Argued June 8, 1956.
Decided Oct. 24, 1956.
Certiorari Granted, Judgment Vacated Feb. 25, 1957.
See 77 S.Ct. 526.
 
 Francis T. Anderson, Philadelphia, Pa. (Gray, Anderson & Schaffer, Philadelphia, Pa., on the brief), for plaintiffs-appellants.
 Louis Nizer, New York City (Phillips, Nizer, Benjamin & Krim, New York City, Walter S. Beck, Seymour Shainswit, New York City, on the brief), for Nat. Screen Service Corp.
 Before GOODRICH, KALODNER and HASTIE, Circuit Judges.
 KALODNER, Circuit Judge.
 
 
 1
 Was there, in the cases involved in these appeals, a genuine issue as to a material fact which, under well-settled principles, precluded the entry of summary judgments adjudicating the defendant-appellant, National Screen Service Corporation ('National') to be an unlawful monopoly?
 
 
 2
 That is the critical issue presented by these appeals from decrees of the District Court for the Eastern District of Pennsylvania granting sweeping injunctive relief against National pursuant to the entries of summary judgments against it.[1]
 
 
 3
 It may be stated preliminarily that involved are private anti-trust suits for treble damages and injunctive relief premised on alleged violation of the Sherman Anti-Trust Act.[2] All the plaintiffs and National are in the business of servicing motion picture theatres ('exhibitors') with advertising matter generally referred to as 'standard accessories' which consist principally of lithographed posters, photographs of scenes from motion pictures described as 'stills', and other articles designed for display in and about theatre lobbies in order to promote attendance at current or future exhibition of a particular picture.
 
 
 4
 Originally each motion picture producer created and prepared its own standard accessories for each of its feature motion pictures for distribution through its own exchanges, throughout the country, where they were leased to exhibitors. Local service concerns were later formed to acquire quantities of the posters of all the major companies which were supplied to exhibitors on a rental basis. The poster-renters were able to offer the exhibitor an opportunity to obtain all of his poster requirements from a single source instead of having to deal with eight different companies.[3]
 
 
 5
 National was incorporated sometime in the early 1920's. Originally its business was limited to servicing exhibitors with supplies of trailers or 'prevues' which are short advertising films shown on the theatre screen. In the 1930's it also began distributing a special kind of poster, more elaborate and more costly than the standard posters, known as specialty accessories. By 1940 National had contracts with six of the eight major film companies giving it the exclusive right to distribute trailers throughout the nation, and contracts with four of the eight majors giving it the exclusive right to distribute specialty accessories in the same territory. In order to carry on its trailer and specialty accessory business, National maintained eight branch offices, or exchanges.
 
 
 6
 At the end of 1939 and early in 1940, Paramount Pictures, Inc. and RKO Radio Pictures, Inc. entered into separate agreements with National, each granting to National an exclusive license to manufacture and distribute standard accessories on a nation-wide scale. Both contracts were effective February 1, 1940, for five-years terms. A third exclusive contract was obtained by National from Loew's Incorporated on February 6, 1942.
 
 
 7
 In April, 1942, twelve poster-renters[4] instituted an action under the anti-trust laws against National and the three contracting film companies.[5] In April, 1943, the litigation was settled by an agreement whereby the then plaintiffs consented to a dismissal of their respective causes of action with prejudice, and National granted to each of them a sublicense wherein National agreed to supply the then plaintiffs with all of their respective requirements of standard accessories which National was then manufacturing under exclusive agreements and might subsequently manufacture under future exclusive licenses with other producers. The sub-license agreements were for a term of three yars from May 1, 1943. They were renewed in 1946 for a five-year term to April 30, 1951. Similar agreements were effected with poster-renters who had not been parties to the 1942 litigation.
 
 
 8
 During the four-year period following the 1942 settlement, the five remaining major motion picture producers granted National exclusive right over their copyrighted standard accessories similar to the agreements with the other three majors. National also was given exclusive specialty accessory privileges between 1942 and 1946 by the four companies with whom no such contracts had previously existed.
 
 
 9
 All of National's exclusive standard accessory contracts with the major producers, excepting only RKO and Loew's Incorporated, expired December 31, 1949. The RKO contract expired a month later, January 31, 1950 and the Loew contract some two years later, February 28, 1952.
 
 
 10
 Four of the major producers, RKO, Columbia Pictures Corporation, Twentieth Century Fox Film Corporation and Universal Pictures Company entered into new agreements with National early in 1950. These contracts were in terms non-exclusive in that licenses to produce and distribute standard accessories would be granted to anyone who undertook to deal on a nation-wide basis in standard accessories, specialty accessories and trailers. On February 16, 1950, the relationship between National and Warner Bros. Distributing Corporation was extended for an indefinite period pending negotiations. This was done by letter agreement which did not cover the detailed questions dealt with in the former contract and said nothing about exclusivity. Apparently none of the other companies entered into any written agreement with National after 1949. The Fox, RKO, Columbia and Universal contracts expired at the end of 1954. However, it appears that the standard accessories of all the producer-distributor-defendants continued to be produced substantially in conformity with the expired agreements.
 
 
 11
 All the sub-licenses which National had granted to plaintiffs, or renewals thereof, expired in March or April, 1951. National, however, continued (and still continues) to make supplies available to plaintiffs.
 
 
 12
 Coming now to the tangled skein of litigation which preceded the granting of the summary judgments and entries of decrees here involved:
 
 
 13
 The history of this litigation began on August 18, 1949, when the Lawlor action against National and the so-called 'big eight' producer-distributor motion picture companies was instituted. It was followed in quick succession by the Lipp, Siegel and Schrader suits. In October, 1950 all four plaintiffs moved for summary judgment. The motions were argued and considered as a unit by District Judge McGranery. On July 25, 1951, Judge McGranery filed an opinion, reported at D.C.E.D.Pa.1951, 99 F.Supp. 180 granting summary judgment for the injunctive relief requested by the plaintiffs against National but denying summary judgment against the producer-distributor-defendants on the ground that, (page 187.) 'The affidavits submitted by the defendants clearly indicate that each producer-distributor entered into its agreement with National Screen independently, for legitimate business reasons related to its own enterprise * * *', and 'a disputed question of fact appears, precluding summary judgment.'
 
 
 14
 Judge McGranery's opinion makes it clear that it was premised on his view that National's exclusive contracts with the producer-distributors were, per se, as a matter of law, an illegal monopoly under the Sherman Anti-Trust Act.
 
 
 15
 That is demonstrated by these quotations from his opinion:
 
 
 16
 At page 185: 'By virtue of its exclusive contracts with the eight other defendants (or their affiliates), National Screen has the power to remove plaintiffs from competition * * *. No specific intent to monopolize is necessary; the only relevant intent is the intent to enter into the business arrangements which give rise to the power. By entering into exclusive agreements with the eight producer-distributor defendants (or their affiliates), National Screen has acquired the power to exclude competition and demonstrated its intent to exercise that power. Hence, it would appear that National Screen is in violation of Section 2 of the Sherman Act.'
 
 
 17
 Again, at page 187: '* * * the acquisition by National Screen of exclusive license agreements for the distribution of standard accessories of the 'big eight' forecloses competition from a substantial market, a course of conduct unreasonable per se.'
 
 
 18
 It is pertinent to observe that Judge McGranery was of the view, (page 186) 'It is entirely irrelevant that there may have been no resort to unfair competitive practices' and that as earlier stated he had found no evidence of any conspiracy between National Screen and the producer-distributors in the negotiation of the exclusive contracts.
 
 
 19
 For reasons not here pertinent the plaintiffs failed to submit to Judge McGranery a decree of injunction against National although he suggested in his opinion that they do so.[6] It was not until mid-year, 1955 that the plaintiffs moved for summary judgment before Chief Judge Kirkpatrick, Judge McGranery having resigned in the meantime.
 
 
 20
 Chief Judge Kirkpatrick in an unreported opinion filed August 8, 1955 granting summary judgment for injunctive relief against National Screen stated that 'Not being persuaded that Judge McGranery's opinion was erroneous I shall follow it.' On December 15, 1955, pursuant to the opinion noted, there issued the decrees under review.
 
 
 21
 It must be observed that in his opinion Chief Judge Kirkpatrick noted that the exclusive contracts on which Judge McGranery had premised his deposition had long expired and that National Screen had '* * * produced affidavits which have not been contradicted showing that, since the decision in the Lawlor case, it has either eliminated or offered to eliminate all the features of its agreements with the producer-distributors which the Court found objectionable, especially the exclusive character of the licenses granted.' As to the latter Chief Judge Kirkpatrick said:
 
 
 22
 'I am not called upon to decide whether, if these actions had been commenced after these changes in the contracts were made, the plaintiffs would be entitled to a judgment against National Screen. I am dealing with the situation existing when these actions were commenced * * *'
 
 
 23
 Further, it may be noted parenthetically that at the hearing on the settlement of the decrees (September 14, 1955) National offered to put the plaintiffs '* * * in exactly the same position as National Screen is today in every particular', but the offer was rejected.
 
 
 24
 Again, it may be noted that at this same hearing plaintiffs' counsel admitted that the exclusive contracts did not, as a matter of law, per se constitute a violation of the Sherman Anti-Trust Act, going so far as to state 'Exclusivity has nothing to do with it.'[7] And at the time of oral argument plaintiffs' counsel conceded that exclusive agreements are not illegal per se.
 
 
 25
 Original emphasis on the exclusive nature of the agreements between National and the producer-distributor-defendants has been shifted by plaintiffs to a theory which appears to declare that while all exclusive agreements are not illegal per se, these particular exclusive agreements are illegal per se and any arrangement, even absent the written agreements, which gives National exclusive rights of manufacture and distribution is violative of the anti-trust laws. Plaintiffs have not met, head-on, National's contentions, contenting themselves with characterizing them as 'plain drivel'.[8]
 
 
 26
 The highlights of National's contentions may be stated as follows: (1) Judge McGranery erred in ruling that the exclusive agreements were a per se violation of the anti-trust laws and Chief Judge Kirkpatrick erred in following that ruling and using it as the premise for the disposition of these cases. On this score National points to the fact, as stated above, that plaintiffs no longer view the anti-trust laws as a flat prohibition against all exclusive agreements; (2) this being so, the judgments should be reversed since there was a dispute as to numerous material issues of fact (subsequently stated) which under the law precluded entry of summary judgment; (3) and, further, permanent injunctions may not be granted as a matter of law without proof of threatened injury to plaintiffs' business,[9] by reason of exclusive agreements which, in any event, had not been in effect for years prior to the entry of the decrees of injunction.
 
 
 27
 With respect to National's first contention, exclusive agreements are not per se violation of the anti-trust laws and are permitted in circumstances where the facts disclose a course of conduct and reasonableness of action not prohibited by the anti-trust laws. See United States v. Bausch & Lomb Optical Co., D.C.S.D.N.Y.1942, 45 F.Supp. 387, affirmed 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; United States v. Columbia Steel Co., 1948, 334 U.S. 495, 522-523, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Imperial Chemical Industries, Ltd., D.C.S.D.N.Y.1952, 105 F.Supp. 215, 244-245. In our opinion Judge Kirkpatrick and Judge McGranery erred in premising their decisions upon the per se invalidity of exclusive agreements.
 
 
 28
 National next urges that the existence of disputed issues of fact here precluded the granting of summary judgment. It is well-settled that summary judgment may be granted only if the pleadings, depositions, admissions and affidavits '* * * show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c), 28 U.S.C.; see F.A.R. Liquidating Corp. v. Brownell, 3 Cir., 1954, 209 F.2d 375. Any doubt as to the existence of a genuine issue of fact is to be resolved against the moving party. Sarnoff v. Ciaglia, 3 Cir., 1947, 165 F.2d 167, 168. Further, documents filed in support of a motion for summary judgment are to be used for determining whether issues of fact exist and not to decide the fact issues themselves. Frederick Hart & Co. v. Recordgraph Corp., 3 Cir., 1948, 169 F.2d 580.
 
 
 29
 So viewing our function, we must determine whether there is any material fact, bearing on the proof of a monopoly, genuinely in issue.
 
 
 30
 The power to control prices or exclude competition is the essential element of monopoly. Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619. The actual raising of prices or exclusion of competition is not a requirement to meet this essential element. American Tobacco Co. v. United States, 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. Promotion of competition in open markets, the overall purpose of the anti-trust law, requires measurement of the power in terms of an 'area of effective competition' in order to determine its illegality. Standard Oil Co. of California v. United States, 1949, 337 U.S. 293, 299 note 5, 69 S.Ct. 1051, 1055, 93 L.Ed. 1311; see United States v. E. I. du Pont de Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994. With respect to the effectiveness of a defendant's power in a particular market, United States v. E. I. du Pont de Nemours & Co., D.C.1953, 118 F.Supp. 41, affirmed 1956, 351 U.S. 377, 76 S.Ct. 994, is illuminating. There the District Court said 118 F.Supp. at page 197:
 
 
 31
 "Market control' or lack of 'market control' are ultimate facts. They are determined by fact-finding processes, and on the basis of knowledge and analysis of all competitive factors which bear on a seller's power to raise prices, or to exclude competition. Existence of monopoly powers is not made on the basis of assumptions as to competitive markets. If the price, quantity of production and sale, and the quality of a seller's product are determined by pressures exerted on him by buyers and sellers of another's product, the products and the sellers must, for purposes of any realistic analysis, be in the same 'market' and must be in competition with each other.'
 
 
 32
 Definition of the 'market' requires a consideration of substitutes, the significance of which was explained in Times-Picayune Publishing Company v. United States, 1953, 345 U.S. 594, 612 note 31, 73 S.Ct. 872, 882, 97 L.Ed. 1277, as follows:
 
 
 33
 'For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small.'
 
 
 34
 Having established a defendant's dominance in a relevant market, the 'monopoly in the concrete,' early discussed in Standard Oil Co. of New Jersey v. United States, supra, 221 U.S. at page 62, 31 S.Ct. at page 516, the Sherman Act, 2 prohibition further requires a monopoly consciousness, an attainment of dominance by anti-competitive activities. Alone, a dominant market position and the monopolistic attributes of such a position to not entail illegality. Mr. Justice Frankfurther, concurring in United States v. E. I. du Pont de Nemours & Co., supra, 351 U.S. at page 413, 76 S.Ct. at page 1016, said:
 
 
 35
 'The boundary between the course of events by which a business may reach a powerful position in an industry without offending the outlawry of 'monopolizing' under § 2 of the Sherman Act and the course of events which brings the attainment of that result within the condemnation of that section, cannot be established by general phrases. It must be determined with reference to specific facts upon considerations analogous to those by which § 1 of the Sherman Act is applied.'
 
 
 36
 These 'considerations' were succinctly stated by Mr. Justice Brandeis in Board of Trade of City of Chicago v. United States, 1918, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683:
 
 
 37
 'The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.'
 
 
 38
 If National's dominant position was the result of natural business growth, of development consistent with the intent of the anti-trust laws, it cannot now be condemned. 'The successful competitor, having been urged to compete, must not be turned upon when he wins.' United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 430; see United States v. United Shoe Machinery Corp., D.C.D.Mass.1953, 110 F.Supp. 295, 341-342, affirmed per curiam 1954, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910.
 
 
 39
 National, say the plaintiffs, as a result of its exclusive dealing with the producer-distributor-defendants, has, with reference to standard accessories containing copyrighted materials supplied by the producer-distributor-defendants, the power to raise prices or exclude any and all competition within the market area of those particular accessories. However, National contends that its effectiveness in the market is limited by other forms of advertising such as newspapers, magazines, radio, television, mail and handbills; and further, that the standard accessories which it manufactures and leases are not essential to the exhibitor since equally effective articles are available to the exhibitor from other sources such as sign-painters, printers, and other poster-renters.[10]
 
 
 40
 Whether the standard accessories produced and distributed by National are in the same 'area of effective competition' as other media of movie advertising, and whether there are equally effective substitutes for the accessories produced and distributed by National are factual issues, not capable of resolution on pleadings and affidavits. Such issues require determination by the trier of facts only after trial.
 
 
 41
 National contends that the legality of its dominant position is determinable only after a finding and analysis of the facts peculiar to the business involved. On this score National points out, inter alia, that the exclusive agreements between National and the distributor-defendants were motivated by 'legitimate business reasons',[11] that competition has not been restricted, and that plaintiffs have complete access to the standard accessories produced by National. Generally, says National, it has in its pleadings and affidavits shown its development to be consistent with the intent of the antitrust laws.[12]
 
 
 42
 Plaintiffs charge National with these anti-competitive acts: increasing of prices to plaintiffs forcing them to lease material at a loss in order to compete with prices charged the exhibitors by National; refusing to make available to plaintiffs standard accessories which National had in its local exchange where plaintiffs' customers were forced to go; reducing rental prices to exhibitors including plaintiffs' customers if they agreed to buy all advertising material from National; using tie-in sales requiring exhibitors to buy standard accessories from it if they also wanted the specialty accessories and trailers.
 
 
 43
 All of these alleged acts are denied by National.
 
 
 44
 Trial of the disputed factual issues is required to arrive at the ultimate fact-finding as to whether the exclusive agreements between National and the producer-distributor-defendants formed part of a deliberately acquired monopoly, or whether they were part of the natural business growth of National, reasonably necessary to protect the lawful business interests of National and the producer-distributor-defendants.
 
 
 45
 In view of the above it is unnecessary for us to resolve National's contention that the injunctive relief granted was inappropriate in these cases. The District Court will, of course, give consideration to the elements required by Section 16 of the Clayton Act as a basis for any injunctive relief that may be required as disclosed on a trial of the issues.
 
 
 46
 For the reasons stated the summary judgments and injunctive decrees entered by the District Court will be reversed and the causes remanded with directions to proceed in accordance with this opinion.
 
 
 47
 Since the plaintiffs have withdrawn their appeals 11,818 to 11,824 inclusive. they will be dismissed.
 
 
 48
 HASTIE, J., concurs in the result.
 
 
 
 [1]
 The plaintiffs have withdrawn their appeals, Nos. 11,818 to 11,824 inclusive and accordingly they will be dismissed. These appeals were based on alleged inadequacy of the injunctive relief granted plaintiffs by the District Court
 
 
 [2]
 Sections 1 and 2 of the Sherman Anti-Trust Act, 26 Stat. 209, 50 Stat. 693, 15 U.S.C.A. §§ 1 and 2; Sections 4 and 16 of the Clayton Anti-Trust Act, 38 Stat. 731, 737, 15 U.S.C.A. §§ 15 and 26
 
 
 [3]
 Of the eight major motion picture companies of the United States all engage both in production and distribution of motion picture films except defendant United Artists Corporation which deals only in distribution. Defendants Twentieth Century Fox Film Corporation, Columbia Pictures Corporation, Loew's Incorporated and RKO Radio Pictures, Inc., are all corporations engaging in both production and distribution of motion pictures. The remaining three producer-distributor-defendants, Paramount Film Distributing Corporation, Warner Bros. Pictures Distributing Corporation, and Universal Film Exchanges, Inc., are wholly-owned distributing subsidiaries of the parent producing companies
 
 
 [4]
 That suit was captioned 'Allied Poster and Supply Corp. et al. v. National Screen Service Corp. at al., Civil Action No. 2472'. Lawlor, Lipp and Siegel, three of the plaintiffs in these actions, were among the plaintiffs in the Allied suit
 
 
 [5]
 The complaint charged that National intended to monopolize the motion picture advertising accessory business, and that National had also conspired with the other producers, and more specifically that the then existing exclusive agreements violated the Sherman Act and that they, together with the remaining producers, would effectuate and constitute an illegal monopoly. The primary relief requested was (1) an injunction to restrain the continuance of the then existing exclusive agreements and the consummation of the contemplated exclusive agreements, and (2) damages
 
 
 [6]
 On November 20, 1951 the plaintiffs Riff, Mitchel and Vogelstein moved for summary judgment on the injunction phase of the actions which they had instituted, but after a hearing held before Chief Judge Kirkpatrick on June 10, 1952, withdrew their motions
 
 
 [7]
 Following are excerpts from the Notes of Testimony of the September 14, 1955 hearing on settlement of the decrees before Chief Judge Kirkpatrick:
 P. 62 'Mr. Anderson: Now, that whoe clause (as to exclusivity) Your Nonor--and I don't want to exaggerate it-- I should say it is nothing more than a flourish. It has no real significance in the case at all. * * *'
 P. 63: 'The exclusion provision has no bearing at all on the workings of this team, (National and the film companies) which is to sew up the source of supply of posters, which is absolutely independent of-- .'
 P. 78: 'The Court: First of all, tell us what you have to say about what Mr. Beck pointed out as an apparent inconsistency, an inconsistent stress on exclusivity at the time of the McGranery hearings.
 'Mr. Anderson: I have no doubt it is true. I have learned a lot since then, Judge. They tell me Abe Lincoln argued one thing one morning and another in the afternoon. It seems to me that that is just an attack on Anderson. Even now I don't think I am as good as they are.
 'The Court: Well, you seemed anxious to answer it.
 Mr. Anderson: I just wanted to say that. Why drag in questions that aren't pertinent? It isn't a question of whether what I said in 1951 was correct or not or whether it was stupid or anything like that. The question is whether what I am saying now is right.'
 
 
 [8]
 The opening sentence of the brief for plaintiffs-appellees is as follows: 'The greater part of National Screen's fifty-page brief is plain drivel, so it seems, not worth the recognition of a reply.'
 
 
 [9]
 At the oral argument plaintiffs admitted that 'it is substantially correct' that they are not 'being damaged in any way' as far as National's conduct at the present time is concerned. (P. 55 Transcript of Oral Argument)
 
 
 [10]
 In the Affidavit (No. 1) of Herman Robbins, Chairman of the Board of Directors of National, filed February 14, 1951, in the Lawlor suit, the following statements are made (p. 12b, Appendix for National Screen Service Corporation):
 'Many of National Screen's products have incorporated in them copyrighted material. This material is reproduced by National Screen under a license from the copyright owner for which it pays substantial consideration. To the extent that such copyrighted material cannot be copied by competitors without authority from the copyright proprietor, there is a limitation upon its reproduction. But it is not essential for the exhibitor to have copyrighted trailers or accessories. Many of the largest theatres in the United States do not use them, but use instead trailers or accessories containing no copyrighted material. There are many available sources for such competitive products.'
 P. 14b: 'Furthermore, it is not essential that copyrighted standard accessories be used. There are available unlimited sources of supply of noncopyrighted accessories. Such accessories are produced and widely used. For example, window cards are printed by any printer. Mats are supplied by various independent companies fully equipped and ready to serve. Noncopyrighted accessories of other kinds can be and are manufactured by various sign and print shops and lithographing plants. There are many hundreds of these throughout the United States. Any exhibitor who chose to, could avail himself of these competitive sources, and this is done.'
 
 
 [11]
 As was noted above, Judge McGranery in his opinion, 99 F.Supp. 180, at page 187, said: 'The affidavits submitted by the defendants clearly indicate that each producer-distributor entered into its agreement with National Screen independently, for legitimate business reasons related to its own enterprise * * *.'
 
 
 [12]
 In the affidavit of Herman Robbins, supra Note 10, the following 'history' of National's growth and competitive effectiveness is advanced:
 Originally the movie producers leased copyrighted standard accessories directly to exhibitors. Seeing business advantages in the area of poster distribution, 'poster-renters' acquired the copyrighted accessories by illegal methods such as bribery and theft. Measures were taken by producers to eliminate the illegitimate supply which were effective enough to require a group of posterrenters to hire a manufacturer to create infringing material. Relief against the infringement was granted by the courts, but the illegal practices continued.
 Against this background, Paramount (and later other producers) sought a reputable agency to manufacture and distribute its copyrighted standard accessories. In view of National's reputation in the production and distribution of trialers and specialty accessories, it was approached for negotiation with respect to the rights relating to Paramount's standard accessories. Paramount and National successfully negotiated a contract which emphasized quality and effectiveness of the accessories, low cost to exhibitors, and wide and prompt distribution to theatres throughout the United States.
 During the Second World War the shortage of manpower became acute. Due to problems of manufacture and service, several producers solicited National to take over the manufacture, leasing and shipment of their accessories. National was also suffering from limited manpower and loss of experienced help and was therefore reluctant to take on additional responsibilities, and on a number of occasions declined these proposals. However, over an extended period contracts were made with the major producers, some in 1940 and 1942, and some in 1944, 1946 and 1947. Important in the decision of many of the producers to give up their control of the accessories to National was the fact that continuous losses had been sustained by them in this activity.
 In accordance with the desires of the producers National has produced high quality accessories and has kept costs below all comparable standards.
 As to distribution, the facilities of National were found to be inadequate by Paramount. Because it desired to encourage easy accessibility to its advertising accessories, Paramount wished to have a representative number of strategically located offices throughout the country. National added more than twenty new offices to its organization requiring leasehold obligations in excess of five years for each of the acquired branches. The large outlay by National prompted the five-year exclusive clause. No other company existed that could make this large and expensive undertaking, and apparently there has been none since.
 In the case of standard accessories, there is unlimited competition, including even the copyrighted material. National has offered to all poster-renters the right to acquire at wholesale rates its copyrighted standard accessories for lease to exhibitors. They have competed in the same area on equal terms with National without sharing the burden of large investments and risk in manufacture of accessories. The factor of obsolescence alone results in losses to National of hundreds of thousands of dollars each year. Poster-renters avoid this factor since they order from National what they need at a particular time. How effective the other poster-renters are is illustrated by the fact that plaintiffs Lawlor and Pantzer's business with National increased approximately tenfold in the six-year period preceding the institution of the action. These plaintiffs on deposition further testified that every consumer that they had was at one time a customer of National.
 Finally, National's present position in the industry is singularly appropriate. No other poster-renter desires to enter the business of manufacturing the standard accessories. National is the only nation-wide organization with the desire and facilities to do so.