**WALT DISNEY PRODUCTIONS,**
Plaintiff,

v.

**AMERICAN BROADCASTING–PARA-
MOUNT THEATRES, INC.,**
Defendant.

United States District Court
S. D. New York.
Jan. 5, 1960.

Donovan, Leisure, Newton & Irvine, New York City, Cox, Langford, Stoddard & Cutler, Washington, D. C., Granville Whittlesey, Jr., Walter L. Stratton, Helmut J. F. Furth, Charles W. Morse, Jr., New York City, Lloyd N. Cutler, Samuel A. Stern, Washington, D. C., of counsel, for plaintiff.

White & Case, New York City, Bergson & Borkland, Washington, D. C., Orison S. Marden, Edward Wolfe, New York City, Herbert Bergson, Daniel H. Margolis, Howard Adler, Jr., Washington, D. C., of counsel, for defendant.

WEINFELD, District Judge.

The plaintiff moves pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment declaring null and void a certain agreement with the defendant on the ground that it contravenes section 1 of the Sherman Act [1] and offends the basic policy of the Copyright Law.[2] Alternatively, in the event the agreement is held not tainted, the plaintiff seeks a judgment declaring specific restrictive provisions thereof void. It also moves for a temporary injunction restraining the defendant from enforcing the agreement or its restrictive provisions for the balance of its term. The agreement referred to as the "Basic Agreement," as amended, supplemented and modified from time to time, now has been in effect for five years and expires on August 31, 1961, but an option provision permits its extension to August 31, 1962.

The plaintiff and its predecessor corporation since 1923 have been engaged in producing motion pictures for exhibition

1. 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1.

2. Title 17, U.S.C.

in theatres. Since 1954, plaintiff has also produced films for television exhibition.[3] It is the copyright owner of the various theatrical and television motion pictures produced by it.

The defendant is the owner of a television network composed of approximately 215 affiliated television stations with a coverage of 94 per cent of all television equipped homes in the United States. It sells various television programs to commercial sponsors for broadcast over its network. The defendant itself does not produce any programs for television except for a limited number of public service programs. The programs it presents are purchased or obtained from different producers.[4] The defendant also operates a nationwide radio network comprised of approximately 350 affiliated radio stations.

The central figure in the plaintiff corporation, as far as the creation and production of films is concerned, is Walter E. Disney who is under a personal service contract to it. He was one of the pioneers in the development of the medium of the animated cartoon as motion picture entertainment. He is the creator of many publicly recognized fanciful motion picture characters such as "Mickey Mouse," "Donald Duck" and "Three Little Pigs." He supervises the production of all motion pictures produced by the plaintiff, whether cartoon or live, theatrical or television. That his services are unique, extraordinary and invaluable is acknowledged by the parties to this litigation.

Up to 1954, the plaintiff's primary business was, and still remains, the production of theatrical motion pictures for presentation in motion picture theatres.

It has accumulated a library of 500 theatrical motion picture films. These include motion pictures using either the animated cartoon technique, live actors, or combinations of both, and nature pictures.

In 1954, the plaintiff was in need of substantial financial assistance in connection with its contemplated development and construction of an exhibition and amusement park in California, to be known as "Disneyland." At the same time, the defendant was in need of pictures for television in order to improve its competitive position vis-a-vis other national television networks. This mutual need resulted in contemporaneous agreements, or, as phrased by one of the plaintiff's principals, "a joint package venture." The agreements were arrived at only after extensive arm's length bargaining. Under one agreement the defendant participated in the financing of Disneyland to the extent of $2,500,000, subsequently increased to $4,900,000.

Under the other agreement the plaintiff for the first time embarked upon the production of television motion pictures. The parties refer to this agreement dated May 17, 1954, as their Basic Television Agreement. Under its terms, the plaintiff agrees to produce annually for seven years a series of filmed one-hour television programs to be based upon the major themes of Disneyland.[5] The program originally was called "Disneyland" but later changed to "Walt Disney Presents," under which title it is still produced and presented. The program content is to consist of newly filmed material as well as material from plaintiff's library of its prior filmed productions which were suitable for the television program.[6] Each

---

3. Except for two special Christmas shows produced in earlier years.

4. This is defendant's contention which plaintiff challenges urging that defendant is also a producer of programs.

5. Disneyland was opened to the public in July 1955, and contains educational, scientific and amusement features created by Walter E. Disney and others.

6. The program content basically is to follow the pattern of four categories which constitute the major areas of Disneyland, to wit: (1) nature programs similar to the "True Life Adventures" motion pictures; (2) programs concerning people similar to the "Land of Tomorrow" motion pictures; (3) programs based upon a "Frontier Land" exhibit at Disneyland; and (4) programs based upon "Land of Fantasy."

new show is telecast once and repeat programs are provided for in order to have a weekly show during the year. The defendant is granted an exclusive license during the term of the contract to telecast the programs over its television network. The agreement also provides for Walter Disney's personal services as the producer and supervisor of the programs. This was central to the agreement and he personally was a party to the agreement. The contract is terminable at the option of the defendant in the event of his death or should he become totally disabled or leave the employ of the plaintiff. The defendant contends that it sought and obtained from plaintiff not only programs to be televised but also the name, extraordinary skill and the creative production talent of Walter E. Disney individually.

The defendant agreed to pay to the plaintiff the entire program compensation (but not broadcast time and facilities charges) received from sponsors, with a guaranteed minimum. The minimum payments were stipulated for the first three years of the contract. In subsequent years, the payment for the program was to be negotiated by the parties and, failing agreement, the matter was to be submitted to arbitration. The contract also obligated the defendant to advance a substantial sum to the plaintiff for revolving fund purposes to be used for production costs in connection with the first year's production of films. Apart from these contractual commitments, the defendant, in order to attract commercial sponsors for the programs, expended substantial amounts for advertising and other purposes.

The agreement contained various restrictive provisions. These provided that during the term of the agreement the plaintiff will not (1) telecast or license the telecasting of any program in the United States, Canada and Mexico; [7] (2) exhibit or license the exhibition of any program in any motion picture theatre by means of theatre television or sub-

scription television in the same areas; (3) enter into merchandising agreements relating to any character created or owned by plaintiff, whether or not such character is contained in the program licensed to the defendant if such character is used to exploit a product competitive to a product of any sponsor of any program produced by plaintiff and licensed to the defendant; (4) exhibit or license the exhibition of motion picture films owned by plaintiff for telecasting in the United States, Canada or Mexico, except with the defendant's written approval. Plaintiff also agreed that its services, activities and broadcasting in radio and television in the United States, Canada and Mexico, are exclusive to the defendant, with the exception of certain limited activities specified in the agreement.

Walter Disney personally agreed that he would not permit his name to be used in the exploitation of any television or radio program and that he would not develop, produce, direct or supervise the production of any television or radio program except the television program contracted for to the defendant. In effect, the defendant interprets these various provisions (an interpretation which the plaintiff appears to accept) as precluding, for the duration of the contract, both plaintiff and Walter Disney individually from telecasting any programs under the Disney name or containing Disney characters without the defendant's consent.

The rights to telecast the programs, after the defendant exhausted its rights as provided for in the agreement, revert to the plaintiff who also retained all other rights not specifically granted to the defendant. These include, but are not limited to, foreign telecasting, theatrical, educational, merchandising and publicizing rights.

Subsequent to the execution of the Basic Agreement covering the "Walt Disney Presents" program, the parties entered into further arrangements for two additional television program series, the "Mickey Mouse Club" and "Zorro."

7. The reference to Canada and Mexico included only areas in those countries customarily serviced by American networks.

Essentially, the terms of the Basic Agreement were made applicable to these programs and again the defendant was granted an exclusive license to present them over its television network. The programs have been sold to commercial sponsors. The plaintiff's library of television films numbers 300. During the five year period that the agreements have been in effect, the defendant has paid to the plaintiff for licensing fees covering the three programs more than $34,000,000.

As already noted, the parties were to negotiate the license fee payments for the programs after stated periods. They came to accord on the "Walt Disney Presents" program for the season 1959–1960. They failed to agree on the terms for the "Zorro" program for that season. The defendant did not exercise its option to continue the "Mickey Mouse Club" series. During the course of negotiations, a dispute arose as to whether a clause in the Basic Agreement which granted defendant syndication rights to permit the recoupment of program losses was still in effect. This provision obligated the plaintiff upon the expiration or termination of the agreement to make good losses which the defendant allegedly had sustained with respect to the programs and if plaintiff failed to do so, the defendant was given the right to syndicate the program for one-year periods not exceeding five years, until it was made whole for the alleged program losses. Plaintiff sought to eliminate the questioned provision; defendant insisted upon its retention.

Upon failure to resolve this difference as well as that pertaining to the license fees to be paid for "Zorro," the defendant notified the plaintiff that by virtue of the restrictive clauses in the agreements, the plaintiff was not free to offer the program or any other Walt Disney television production to others. Plaintiff responded by repudiating and disaffirming the agreement as illegal under the antitrust laws and the Copyright Law. It contends that the restrictive provisions, which purport to extend to copyrighted material other than that involved in the programs licensed to the defendant, go beyond what is reasonably required to protect the defendant's interest in "Walt Disney Presents," "Mickey Mouse Club" and "Zorro." It urges that the effect of the agreement and the restrictions is to suppress not only further production of the "Zorro" and "Mickey Mouse Club" programs, but also to stifle the creation of new literary properties and to prevent the release to the public of copyrighted theatrical motion picture films contained in its library and which are not licensed to the defendant under the Basic Agreement. In end result, the plaintiff contends that all such programs, theatrical and television, are forced off the market and that it is effectively restrained from competing with, or dealing with any competitor of, the defendant. Accordingly, it argues that since the restrictive provisions embrace theatrical and television programs not included in the limited copyright monopoly granted to defendant as licensee, they are illegal per se.

The defendant, on the other hand, contends that the exclusive licensing to it of the programs is not illegal per se. Further, it urges that the restrictive provisions are reasonable and necessary to protect its substantial investment in the programs and to secure sponsorship of them; that the restrictive provisions are required to prevent dilution of that which it purchased from the plaintiff, to wit, the copyrighted television programs which feature the Disney name as well as the fictional characters created by him; that the extension of the restrictions to copyrighted films other than those immediately involved is justified since the Disney name and characters are significant, have great audience appeal and the programs licensed to the defendant have included material from plaintiff's entire library, whether theatrical motion pictures or television films. For example, the defendant points to the fact that it is presently obligated to pay to the plaintiff for the "Walt Disney Presents" program for the current 1959–1960 season the sum of $4,160,000 and if other Disney programs, whether "Mickey Mouse

Club," "Zorro," or any others are licensed to other television networks for telecasting, contrary to the restrictive provisions, the value and saleability of the "Walt Disney Presents" program will be greatly impaired and its investment imperiled. These, in broad outline, are the respective contentions of the parties.

Upon a review and study of the voluminous record presented on this motion for summary judgment, the Basic Agreement and the subsequent agreements of modification, amendment and supplementation, I am satisfied that this is not a case for summary judgment.

The agreement granting to the defendant the exclusive right for a fixed term to telecast pictures produced and copyrighted by the plaintiff does not necessarily constitute a per se violation of the antitrust laws.[8] Whether or not the restrictive provisions were reasonably required to protect the exclusive license granted to the defendant and the exploitation of its rights under the license is a question of fact, the determination of which depends upon the nature of the product or services involved, the extent of the market, competitive conditions, trade practices and peculiarities of the particular industry in which the restraint is applied, as well as other factors.[9] In

general, the inquiry must focus upon whether the restraint provisions were grounded upon practical business requirements to afford fair protection to the defendant, who in acquiring from the plaintiff the telecast rights and thereafter exploiting them, expended and continues to expend huge sums, or whether they were aimed at restraining or suppressing competition.[10]

In sum, the basic issue is whether the restrictive provisions exceed the outer limits of restraint reasonably necessary to protect the defendant in the enjoyment of that which it purchased from the plaintiff so that in end result they impinge upon the public interest.[11] The various factors which need be considered in resolving the fundamental issue as to the reasonableness of the restraint are not too clearly delineated on this record. They present such involved and complex questions "that it is better first to let them be fully developed at a trial and findings made after that has been done."[12]

Apart from the paucity of information on the various relevant factors which are germane to the basic issue of the reasonableness of the restraint, one essential fact position taken by the plaintiff—that it and the defendant are "potential" com-

8. Cf. Federal Trade Commission v. Motion Picture Advertising Serv. Co., 1953, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426; Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, certiorari denied, 1957, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed. 38; Lawlor v. National Screen Serv. Corp., 3 Cir., 1956, 238 F.2d 59, affirmed as to denial of summary judgment, 1957, 352 U.S. 992, 77 S.Ct. 526, 1 L.Ed.2d 540; Foundry Services, Inc. v. Beneflux Corp., 2 Cir., 1953, 206 F.2d 214; Bascom Launder Corp. v. Telecoin Corp., 2 Cir., 204 F.2d 331, certiorari denied 1953, 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401; United States v. Paramount Pictures, Inc., D.C.S.D.N.Y.1946, 66 F.Supp. 323, affirmed in part, reversed in part, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.

9. Cf. Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 615, 73 S.Ct. 872, 97 L.Ed. 1277; United States v. Columbia Steel Co., 1948, 334 U.S. 495,

527, 68 S.Ct. 1107, 92 L.Ed. 1533; Board of Trade v. United States, 1918, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683; United States v. Bausch & Lomb Optical Co., D.C.S.D.N.Y.1942, 45 F.Supp. 387, affirmed by an equally divided Court, 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024.

10. Cf. Federal Trade Commission v. Motion Picture Advertising Serv. Co., 1953, 344 U.S. 392, 396, 73 S.Ct. 361, 97 L.Ed. 426; United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 282, 46 L.R.A. 122, affirmed, 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136.

11. United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271, 282, affirmed 1899, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Bascom Launder Corp. v. Telecoin Corp., 2 Cir., 204 F.2d 331, certiorari denied 1953, 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401.

12. Foundry Services, Inc. v. Beneflux Corp., 2 Cir., 1953, 206 F.2d 214, 216.

petitors in the production and marketing of television programs—is sharply challenged. An issue exists here as to whether defendant, like the plaintiff, is engaged in the business of producing television programs or whether its business activities are confined to selling television programs which it purchases from various producers, to commercial sponsors for broadcast over its networks. Clearly this is no case for summary judgment.

The motion for summary judgment on the first cause of action is denied, as is the motion for preliminary injunctive relief.